2022 IL App (1st) 201361

SECOND DIVISION
September 30, 2022

No. 1-20-1361

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

|  |  |  |
|---|---|---|
| JOHN SCATCHELL, | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
|  | ) | Cook County |
|  | ) |  |
| v. | ) | 18-CH-16150 |
|  | ) |  |
| THE BOARD OF FIRE AND POLICE COMMISIONERS | ) |  |
| FOR THE VILLAGE OF MELROSE PARK; DIRECTOR | ) |  |
| SAMUEL PITASSI; DEPUTY CHIEF MICHAEL | ) |  |
| CASTELLAN; THE VILLAGE OF MELROSE PARK | ) |  |
| COMMISSIONER MICHAEL CAPUTO; | ) |  |
| COMMISSIONER PASQUALE ESPOSITO, | ) |  |
| and COMMISSIONER MARK RAUZI, | ) | Honorable |
| Defendants-Appellees. | ) | Pamela McLean Meyerson, |
|  | ) | Judge Presiding |
|  | ) |  |

_____

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices Howse and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiff John Scatchell was a police officer for the Village of Melrose Park. In late

2017, he went on paid sick leave to recuperate from an injury to his neck, back, and arm he

suffered while on duty, which left him with pain and numbness. Shortly after he went on leave,

however, someone tipped off the Melrose Park Police Department that he was out hunting when

he should have been at home resting. The department began investigating if he was running afoul of the sick leave policy. Later, an Illinois conservation police officer watched Scatchell and several other men shooting shotguns while waterfowl hunting in a boat Scatchell owned.

¶ 2 One of those other men was Vito Scavo, the former Melrose Park police chief and a convicted felon. When the boat came ashore, the conservation officer confronted Scatchell and Scavo; the officer already knew that Scavo could not legally possess a gun. When the officer asked Scatchell if he had seen Scavo shooting, Scatchell demurred; he said he could not say one way or the other if Scavo held or fired a shotgun. Having watched Scatchell and Scavo shoot in the same boat together for more than 90 minutes, the conservation officer did not believe him.

¶ 3 Neither did defendant here, the Board of Fire and Police Commissioners for the Village of Melrose Park (Board). After the department brought disciplinary charges against Scatchell, the Board held a multi-day hearing to determine if he had broken department policies. When the department ordered Scatchell to testify at that hearing, he asserted his fifth amendment right to remain silent and refused to take the stand, fearful that anything he said might be used to criminally prosecute him for the incident with Scavo. See U.S. Const., amend. V. The department added a charge of insubordination, and the Board later determined that he violated numerous policies and terminated him.

¶ 4 Scatchell appealed to the circuit court of Cook County and argued, among other things, that he was terminated because he relied upon his fifth amendment right. That court upheld the Board's decision, and Scatchell appealed. He again insists that he was fired because he asserted his constitutional right to remain silent, but he fails to appreciate that he was immune from criminal prosecution once the Village placed him in a situation where he had to answer its questions or risk losing his job. While an officer cannot be fired for asserting his right to remain

silent, he risks being dismissed for insubordination when he refuses to answer questions about his job duties, as long as those answers cannot be used to prosecute him. That is what happened here, and because the evidence amply supports the Board's findings that Scatchell violated other departmental policies, we affirm.

¶ 5                                    BACKGROUND

¶ 6        John Scatchell joined the Melrose Park Police Department in 2012. In February 2015, he was injured while on the job when he and another officer physically detained someone outside Gottlieb Hospital. After the incident, he felt pain in his back and neck. The injury prevented Scatchell from working for a while, but he returned to full duty in April that same year. In late October 2017, the pain returned. Scatchell went to see Dr. Maryam Sandoval, his primary care physician, who gave him a note advising him to rest at home. At that point, Scatchell went on departmental paid sick leave to rest and recover.

¶ 7        The Village of Melrose Park (Village) prohibits officers on sick leave from participating in activities "which may impede recovery from the injury or illness" that prompted their leave. On November 14, 2017, a few days after Scatchell went on leave, someone slid a note under Deputy Chief Michael Castellan's office door. The note accused Scatchell of going hunting while on sick leave and alleged that he was receiving preferential treatment because of his family connections in the department. Melrose Park Police began to investigate Scatchell.

¶ 8        In late November 2017, Melrose Park Police Sgt. Anthony Caira called his counterpart, Sgt. David Wollgast, at the Department of Natural Resources Conservation Police Department. Caira told Wollgast he believed that Scatchell and Vito Scavo—the former police chief in Melrose Park and a convicted felon—were going hunting in a nearby area. Wollgast told one of his officers, William Bergland, to be on the lookout for both men.

¶ 9        On November 20, 2017, at about 7 a.m., Bergland saw Scatchell and Scavo together in a boat with a duck blind, waterfowl hunting on a small lake near Oswego. From approximately 230 yards away, Bergland watched both men with a pair of binoculars for between 90 and 120 minutes. During that time, Bergland saw both Scavo and Scatchell shoot their shotguns several times. The record indicates that they were with several other men at the time.

¶ 10        When Scavo and Scatchell came ashore, Bergland met with them. Bergland then asked Scatchell if he had seen Scavo shooting; Scatchell responded that he "could not say whether he did or not." Bergland asked Scatchell the same question again, after telling him that he had been watching the boat for a long time. Scatchell said something to the effect that "we're all law enforcement here" and again did not say if he had or had not seen Scavo firing a gun. Although Scatchell was polite during the interview, Bergland did not believe he was telling the truth. When Bergland asked Scavo if he had been firing a shotgun, however, Scavo admitted that he had been.

¶ 11        The next day, November 21, Scatchell sent Dr. Sandoval an e-mail complaining of continued pain and numbness in his neck and arm. A few days later, Scatchell sent another e-mail, asking Sandoval to provide a note allowing him to stay off work but to allow him light exercise.

¶ 12        In January 2018, department leadership, along with one of the Village's attorneys, interviewed Scatchell as part of an investigation in the incident with Scavo. But they first provided Scatchell with this written warning:

>    "We received information that you may have been involved in a situation where a
>
>    felon was in possession of and used a firearm. We are conducting an investigation
>
>    into the allegations that were reported to us.

You are hereby advised that you are given immunity from criminal prosecution on the basis of your answers to the questions you are asked today. Stated another way, nothing you say in this investigation will be given to any Illinois or federal law enforcement agents or offices.

Additionally, nothing that you say during the interrogation today can or will be used against you in any criminal proceeding.

Your statements will not be disclosed to them at any time or in any investigation or criminal proceeding.

Having been given immunity as set forth above, you are hereby warned that because of that immunity, you may not refuse to answer the questions on the ground that the answers may incriminate you. Accordingly, if you refuse to answer the questions, you will be subject to discipline up to and including your dismissal for failing to comply with our directive that you answer our questions related to this investigation."

¶ 13 Scatchell signed the bottom of the notice, acknowledging that he received and fully understood it. The word "Garrity" is written on the top of the notice. After being given the notice, Scatchell answered the Village attorney's questions.

¶ 14 Scatchell said he was injured in 2015 but that the pain returned to his neck and arm in October or November 2017. He went to see Dr. Sandoval, who wanted him to "play it cautious" because of the prior injury. Despite his taking some medications, the pain and numbness persisted, Scatchell said, so he went for further tests. Dr. Sandoval told him to rest at home. Around November 9, 2017, he gave his supervising sergeant a note about the injury and went on sick leave.

¶ 15    Scatchell said he did not believe he had to stay at home the entire time while on sick leave, although he later heard "through the grapevine" that Castellan believed he was supposed to. Instead, Scatchell interpreted Sandoval's note as requiring resting but that he could "go about my everyday normal life."

¶ 16    Scatchell admitted he was an avid waterfowl hunter and normally went hunting most days during the season, which ran in October and November. In November 2017, he did not tell Sandoval he was going hunting because "it never came up in conversation." In total, Scatchell said he went hunting at least 5—and perhaps as many as 10—times in late 2017 after his neck and back began to hurt.

¶ 17    Scatchell also acknowledged he was listed as a "guide" for a company called "IDecoy Guide Services" (IDecoy), which was a company he started with Scavo. Scatchell described it as "Scavo's company" but said he was "in the capacity to guide with him." He also admitted he did not seek approval from the department to work with IDecoy. Scatchell stated that he did not consider IDecoy employment to be "work" because he "didn't make any revenue off of it." Scatchell also said he knew Scavo was a felon and that, as a felon, it was illegal for him to use a firearm while hunting.

¶ 18    Scatchell said that in November 2017 he owned a boat with a duck hunting blind, which conceals the shooter, built on it. He described the boat as approximately 21 feet long with the blind and 6 feet wide. On November 20, 2017, he left his house at around 4 a.m. to go duck hunting with some friends, including Scavo. When they arrived, the men got the boat ready, loaded it up, and went out onto the lake to prepare for the day. The men—there were four of them, including Scatchell and Scavo—and one boy then went hunting for an hour or two. When asked if he saw Scavo shoot or possess a firearm, Scatchell repeatedly said, in one form or

another, "not to my knowledge, no."

¶ 19     On March 27, 2018, Police Director Samuel Pitassi and Castellan filed 12 counts of disciplinary charges against Scatchell with the Board. On May 10, 2018, Scatchell (through counsel) filed an answer to the charges. He also attached a "true and correct copy" of the transcript of his interrogation with investigators to the answer as an exhibit.

¶ 20     The Board held a multi-day evidentiary hearing into the charges, beginning on October 2, 2018. The Village first called Dr. Sandoval to testify. She said that she began treating Scatchell in 2017, though she was aware he had been injured in 2015. In October 2017, Scatchell told her he had awakened one morning with severe pain on his right side that radiated down his shoulder and to his arm. Shortly after seeing the doctor, Scatchell e-mailed her, requesting a doctor's note for his job. In that e-mail, Scatchell continued to complain of pain. Sandoval provided him with a note saying he was in active treatment and told to rest at home.

¶ 21     Sandoval said she received another note on November 21, 2017, in which Scatchell said he still had considerable pain and numbness. He told her he had not engaged in any activity other than stretches and applying hot and cold compresses. A few days later, Sandoval prepared another note for Scatchell, allowing him to remain off work but permitting him to resume light exercise and walk outside his home.

¶ 22     The hearing was continued to October 22, 2018. At that hearing, the Village attorney told the Board it intended to call Scatchell to testify. The following exchange occurred:

>     "MR FOWLER [(COUNSEL FOR THE VILLAGE)]: *** [W]e could call Officer Scatchell.
>
>     MR COOPER [(COUNSEL FOR SCATCHELL)]: ***Officer Scatchell has a right not to incriminate himself. So Officer Scatchell will not take the stand.

* * *

MR FOWLER: We call Officer Scatchell. And I would remind Officer Scatchell that on January 9th, he was specifically given a *Garrity* warning where he was required to answer questions, ordered to answer questions, and was given the appropriate *Garrity* warning at the time. And I would ask Deputy Chief Castellan to now verbally renew the *Garrity* warning that Officer Scatchell was given on January 9th, 2018.

* * *

MR COOPER: So the *Garrity* has no applicability to an administrative hearing. *** There is no applicability of *Garrity* to this proceeding. [Scatchell] has a Fifth Amendment right not to incriminate himself. And the only party—or let me rephrase it. The only one who can call him as a witness is me. Not Mr. Fowler. I have yet to make a decision as to whether or not Officer Scatchell will give testimony. But he will not take the stand at this point.

* * *

MR FOWLER: Deputy Chief Castellan, would you give Officer Scatchell an order to take the stand and answer questions pursuant to his *Garrity* warning?

DEPUTY CHIEF CASTELLAN: John.

OFFICER SCATCHELL: Yes.

DEPUTY CHIEF CASTELLAN: I order you to take the stand and answer all questions truthfully and honestly.

OFFICER SCATCHELL: At this time I assert my Fifth Amendment right."

¶ 23    The Board asked the parties to file written briefs discussing the consequences, if any, of Scatchell's refusal to testify.

¶ 24    Three days later, the hearing resumed. The Village sought to add a disciplinary charge for insubordination because Scatchell refused to follow Castellan's order.

¶ 25    Scatchell contended the charge was improper because Scatchell had a right not to incriminate himself and, accordingly, could refuse to testify about the incident with Scavo. When questioned by the Board, Scatchell's attorney reiterated that, even if Castellan advised Scatchell that the answers he gave could not be used against him in criminal proceedings, Scatchell still would not answer questions and would continue to assert his fifth amendment privilege to remain silent.

¶ 26    The Village, meanwhile, argued the order to testify was proper and that Scatchell had immunity to testify, meaning he had no good reason not to take the stand. If he refused, the Village argued, the Board could draw a negative inference against him. Scatchell agreed on this last point but remained steadfast in his refusal to testify. The Board allowed the Village to add the amended charge.

¶ 27    The Village rested its case, arguing that Dr. Sandoval's testimony, Scatchell's admissions in his interrogation (which were attached to his answer), and the negative inference the Board could draw against him proved he had violated department polices. Scatchell moved for a directed finding, and the Board took his motion under advisement.

¶ 28    For his case, Scatchell first called James Paoletti, an expert on police procedures. Paoletti opined that Scatchell may have violated two Department polices (the basis of counts 1 and 11 against him) but that he did not violate the remaining counts. Paoletti believed a 10- to 30-day suspension without pay was an appropriate punishment.

9

¶ 29    Scatchell's next expert, Bruce Edenson, was a firearms expert who testified that a shotgun would not have subjected Scatchell to severe recoil energy, suggesting that Scatchell's hunting would not have aggravated any existing injury. Scatchell also called Bergland, who detailed the incident with Scavo and his interview with Scatchell.

¶ 30    The Village called David Lombardo in rebuttal, who said generally that a shotgun has recoil.

¶ 31    The Board issued written findings and a decision on December 6, 2018. It found in favor of Scatchell on three counts, and two counts were withdrawn. But the Board found Scatchell guilty of eight counts. In a seven-page opinion, the Board concluded that Scatchell

(1) Abused the Department's sick leave policy "by engaging in a hobby or recreational activity which could impede [his] recovery from illness or injury" because he went hunting on November 20, 2017, after Dr. Sandoval advised him to rest at home and recover (the basis of count I);

(2) Violated Department policy in not reporting his contact with Bergland on November 20 (count II);

(3) Was dishonest when he told the Department he gained 50 pounds because he was inactive, which was contradicted by Dr. Sandoval's testimony (count III);

(4) Gave false information to Bergland when he said he did not see Scavo firing a shotgun on November 20 (count IV);

(5) Engaged in conduct unbecoming a law enforcement officer by abusing the sick leave policy and being dishonest about the incident with Scavo (count VIII);

(6) Assisted Scavo in possessing a firearm on the November 20 hunting trip,

despite the fact that Scatchell knew Scavo was a convicted felon and could not legally

possess a firearm (count IX);

(7) Engaged in outside employment by operating a hunting guide business with

Scavo without first seeking the Department's approval, which violated departmental

policies (count XI); and

(8) Was insubordinate and disobeyed a direct order when he refused to testify in

the hearing after Castellan commanded him to do so, despite being informed that any

answers he gave at the hearing were immune from prosecution (count XIII). On this

count, the Board noted that, once Scatchell was advised that his testimony could not

be used against him, the Village had a "right to inquire into the charges." Scatchell's

decision not to testify also frustrated the Board's efforts as a factfinder.

¶ 32    The Board determined that cause existed to discharge Scatchell and ordered him

removed from office the next day.

¶ 33    Scatchell filed a complaint in the circuit court of Cook County for administrative

review. After the parties fully briefed the issues in the initial complaint, Scatchell sought leave to

amend the administrative record, which the circuit court denied. Scatchell later sought leave to

file an amended complaint, adding eight new counts and several new defendants. The circuit

court denied Scatchell leave to amend his complaint and affirmed the Board's decision in full.

Scatchell now appeals.

¶ 34                                    ANALYSIS

¶ 35    This case comes to us on administrative review. Appeals from administrative hearings

are governed by the Administrative Review Law. See 735 ILCS 5/3-101 to 3-113 (West 2020).

We review the decision of the Board, not the circuit court. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006). Our review extends to all questions of fact and law the entire record presents, but judicial review is strictly limited to the administrative record. *Id.* at 531-32; 735 ILCS 5/3-110 (West 2020). We may not consider new or additional evidence beyond what was originally presented to the Board. 735 ILCS 5/3-110 (West 2020); *Marconi*, 225 Ill. 2d at 532.

¶ 36    The "findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 5/3-110 (West 2020). It is within the Board's province to assign the appropriate weight to the evidence, resolve conflicts presented by it, and determine the credibility of the witnesses. *Prawdzik v. Board of Trustees of the Homer Township Fire Protection District Pension Fund*, 2019 IL App (3d) 170024, ¶ 36. We may not reweigh the evidence or make an independent determination of the facts. *Hoffman v. Orland Firefighters' Pension Board*, 2012 IL App (1st) 112120, ¶ 18.

¶ 37    At the same time, our deference to the Board is not limitless. *Ashmore v. Board of Trustees of the Bloomington Police Pension Fund*, 2018 IL App (4th) 180196, ¶ 41. There must be competent evidence in the record to support the Board's decision. *Miller v. Board of Trustees of the Oak Lawn Police Pension Fund*, 2019 IL App (1st) 172967, ¶ 40. If the record contains evidence that supports the Board's factual conclusions, then we will not upset those findings, even if an opposite conclusion is also reasonable. *Robbins v. Board of Trustees of the Carbondale Police Pension Fund*, 177 Ill. 2d 533, 538 (1997); *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992).

¶ 38    The applicable standard of review depends on the question presented. *Marconi*, 225 Ill. 2d at 532. We will reverse on a question of fact only if the conclusion the Board reached is

against the manifest weight of the evidence, meaning the opposite conclusion is clearly evident. *Id.* On the other hand, we review pure questions of law *de novo*. *Id.* A question of mixed law and fact is reviewed under the clearly erroneous standard. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001).

¶ 39                    I. The Factual Findings and Decision to Terminate Scatchell

¶ 40        Appellate review of an administrative agency's decision to discharge an employee generally has two stages. First, we determine if the agency's factual findings are contrary to the manifest weight of the evidence, as noted above. *Siwek v. Police Board of Chicago*, 374 Ill. App. 3d 735, 737-38 (2007). If the record supports the Board's findings, we decide if those findings provide a sufficient basis for the agency's conclusion that cause exists to terminate the employee. *Id.* It is not our job to determine if we would have been more lenient; instead, our review is limited to whether the Board acted unreasonably or arbitrarily by selecting a type of discipline that was inappropriate or unrelated to the needs of the service. *Krocka v. Police Board of Chicago*, 327 Ill. App. 3d 36, 48 (2001).

¶ 41                            A. Board's Factual Findings

¶ 42        We first review the Board's factual findings that Scatchell violated departmental policies. The Board found against Scatchell on eight counts. We discuss them individually.

¶ 43                            1. Count I: Abuse of Sick Leave

¶ 44        The Department's rules forbade Scatchell from engaging in a hobby or recreational activity while on sick leave that may impede his recovery. It is undisputed that Scatchell's injured neck and upper back prompted him to take sick leave to recuperate. His doctor, Dr. Sandoval, advised him to stay at home and rest. The evidence is clear that, while on sick leave, he went hunting numerous times, during which he fired a shotgun. While there was conflicting

expert evidence about whether firing a shotgun could exacerbate the injury, the Board was in the best position to decide whom to believe. It concluded that firing a shotgun may have impeded Scatchell's recovery and, as such, it violated the department's sick leave policy. We cannot say that the opposite conclusion is clearly evident, and thus we must uphold that determination. See *Marconi*, 225 Ill. 2d at 534.

¶ 45      2. Count II: Failure to Report Contact with Officer Bergland

¶ 46      Scatchell concedes that he did not inform his superiors about the incident on November 20, 2017, when Officer Bergland confronted him for hunting with Scavo. He claims, however, that since he was not the "target" of Bergland's investigation, he had no duty to report it to his department supervisor.

¶ 47      But the policy required Scatchell to report any contact with law enforcement that might result in criminal prosecution; it was not limited to prosecutions of the officer himself. As the Village notes, Scatchell knew that Scavo was a felon who was illegally possessing a firearm, and he knew that the conservation officer thought Scavo had illegally fired the shotgun. So it was obviously a contact with law enforcement that might lead to a criminal prosecution of Scavo, at a minimum. The Board, then, had more than sufficient basis to find Scatchell in violation of the rule requiring him to report this interaction to his employer.

¶ 48      3. Count III: Making False Statements During the Investigation

¶ 49      In his interrogation, Scatchell told the Village that he gained 50 pounds because he was unable to do any kind of exercise. This claim is not contradicted in any way by the record. The record thus does not support the Village's accusation, and the Board's finding, that Scatchell's statement was false. The Board's finding on count III was against the manifest weight of the evidence.

¶ 50            4. Count IV: Making False Statements to Officer Bergland

¶ 51         The evidence amply supports the Board's finding that Scatchell lied to Bergland during Bergland's investigation of the incident on the boat. For at least 90 minutes, Bergland watched Scatchell and Scavo hunt using shotguns. At the time, they were in Scatchell's small boat, which he described as being approximately 21 feet long and 6 feet wide. When Bergland confronted Scatchell after he and Scavo came ashore, Scatchell told him that he "wasn't sure" if Scavo had held a gun.

¶ 52         Bergland did not believe him, and neither did the Board. We have no basis to overturn the Board's finding on this point; it is improbable—to put it mildly—that Scatchell did not know if Scavo, standing only a few feet away from him in the small boat, was handling, if not firing, a shotgun along with everyone else in the boat. The Board's conclusion that Scatchell made a false statement to Bergland is not against the manifest weight of the evidence.

¶ 53            5. Count VIII: Conduct Unbecoming an Officer

¶ 54         Department policies prohibit conduct that is "contrary to good order, efficiency or morale, or tends to reflect unfavorably upon [the] department or its members." The Board concluded that Scatchell's violation of the sick leave policy, coupled with his behavior surrounding the incident with Scavo and Bergland, was conduct unbecoming an officer. For the reasons already discussed, its conclusion is amply supported by the evidence.

¶ 55         6. Count IX: Violating Department Policies for Allowing Scavo to Fire a Shotgun

¶ 56         Scatchell admitted, in his interview, that he knew Scavo was a convicted felon. He also knew, then, that it was illegal for Scavo to possess or fire a gun. Scatchell makes much of the fact that Bergland said it was "100 percent not impossible" that Scatchell did not actually know Scavo was shooting. But being within the realm of possibility is a lot different than being

15

likely or probable. The Board found that Scatchell did, in fact, know that Scavo was handling and firing a shotgun—an obviously illegal act for a felon—and we are in no position to find that the opposite conclusion is clearly evident. Indeed, the opposite conclusion—that Scatchell had no idea whether another man in his rather small boat was using a shotgun over a period of 90 minutes to 2 hours—strikes us as far-fetched at best. We uphold this finding as well.

¶ 57                    7. Count XI: Starting a Secondary Job Without Prior Approval

¶ 58        As for the claim that Scatchell had outside employment without Department approval, Scatchell concedes that he was listed as a "guide" for IDecoy but claims there is no evidence he provided guide services. He is mistaken. In his interrogation, he admitted that he and Scavo accepted money on several dates. Scatchell said he did not consider it work because he did not "make any revenue off of it." But he admitted that the money collected went to "hunting equipment." That sounds like the way a normal business operates. Since Scatchell was listed as a guide, the evidence supported the Board's factual conclusion he was an employee of IDecoy.

¶ 59        Of course, Scatchell could have other employment, so long as it was approved by the department. But Scatchell admitted he did not have approval to work for IDecoy. Scatchell's own expert, Paoletti, opined that he likely violated the secondary-employment policy. The Board came to the same conclusion, and that finding was not manifestly erroneous.

¶ 60                    8. Count XIII: Disobeying a Direct Order

¶ 61        That brings us to the final—and perhaps most contentious—count, insubordination for disobeying a direct order from a superior officer. Scatchell contends that he was fired, at least in part, because he refused to waive his fifth amendment privilege against self-incrimination when the Village called him to testify at the administrative hearing. The Village disagrees, saying that Scatchell was given an order to answer questions about his job after being told that

16

any answers he gave would not be used to prosecute him, refused that order, and then was fired (among other reasons) for insubordination.

¶ 62    The Board ultimately concluded that Scatchell had immunity and accordingly that the Village could force him to testify. Because whether the Village could legally order Scatchell to testify is a question of pure law, our review of this issue is *de novo*. *Marconi*, 225 Ill. 2d at 532.

¶ 63    The fifth amendment states that "[n]o person *** shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. This privilege is not absolute, however; witnesses can be granted immunity to compel their testimony. When the government grants a witness immunity from using compelled testimony and evidence derived from it in a criminal prosecution against them, the privilege the fifth amendment affords the witness is satisfied, and the government can force that person to testify even to self-incriminating statements. See *Kastigar v. United States*, 406 U.S. 441, 448 (1972). This is known as "use and derivative use immunity." (Internal quotation marks omitted.) *Id.* at 443.

¶ 64    A grant of immunity seeks to reconcile the right of the government to compel testimony with the constitutional privilege against self-incrimination. *People v. Gaines*, 188 Ill. App. 3d 451, 455 (1989). Use and derivative-use immunity leaves the witness in substantially the same position as if the witness had claimed the fifth amendment privilege. *Id.* A grant of immunity must afford protection commensurate with the protection the fifth amendment privilege against self-incrimination provides. *Id.*

¶ 65    For example, state law allows the State to grant a witness immunity from prosecution in exchange for truthful testimony. See 725 ILCS 5/106-1 to 106-3 (West 2018). Once their testimony is immunized, it cannot be used as the basis of a prosecution against the witness. That is to say, once the witness has been given immunity, "the reason for the rule permitting a witness

to refuse to give evidence or to be a witness against himself is destroyed, and such privilege cannot be claimed." *Halpin v. Scotti*, 415 Ill. 104, 108 (1953). Immunity statutes appear both at the state and federal level and have long been upheld. See, *e.g.*, *Brown v. Walker*, 161 U.S. 591 (1896); *Ullmann v. United States*, 350 U.S. 422 (1956).

¶ 66       However, there are other forms of immunity. Relevant here is a unique kind of immunity for government employees who are being investigated for misconduct by their public employer, originating in *Garrity v. New Jersey*, 385 U.S. 493 (1967). There, the United States Supreme Court held that, when the government forces police officers to answer questions or give a statement regarding a matter under investigation, the fifth and fourteenth amendments prohibit the government from using any such statements in a subsequent criminal proceeding against those officers. *Id.* at 500.

¶ 67       In *Garrity*, police officers suspected of fixing traffic tickets were summoned to an inquiry before the attorney general. *Id.* at 494. They were warned that, if they did not answer questions from investigators, they would be dismissed, but if they did answer questions, anything they said might be used against them later in criminal proceedings. *Id.* Facing the prospect of losing their jobs if they kept quiet, the officers answered the questions; their answers were later used as the basis of a criminal prosecution against them. *Id.* at 495. The Supreme Court held that, when placed in a position where the officers had to choose between incriminating themselves or being fired, any statement they made was coerced and could not be used in a criminal proceeding against them. *Id.* at 500.

¶ 68       A year later, a similar situation occurred in *Gardner v. Broderick*, 392 U.S. 273 (1968). There, a policeman was being investigated by his employer, who wanted to question him about potential misconduct. *Id.* at 274. The government ordered the officer to testify and to

waive any immunity he might have under the law. *Id.* at 274, 278. The officer refused to do so and was fired for that action. *Id.* at 274-75. The Court, relying on *Garrity*, reversed the termination, as the combination of compelling the officer both to testify *and* waive his *Garrity* protection left the officer with the choice of asserting his right against self-incrimination or losing his job—a notion that obviously ran counter to the principles in *Garrity*. *Id.* at 278-79; see also *id.* at 277 (referring to officer in that situation facing "Hobson's choice between self-incrimination and forfeiting his means of livelihood").

¶ 69　　But the Supreme Court also noted that, if the officer "had refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties, *without being required to waive his immunity* \*\*\*, the privilege against self-incrimination would not have been a bar to his dismissal." (Emphasis added.) *Id.* at 278.

¶ 70　　From this, a principle developed: the government has every right to investigate allegations of misconduct, even criminal, and force employees to answer questions about the investigation, so long as the employee has immunity from criminal prosecution on the basis of their answers. *Atwell v. Lisle Park District*, 286 F.3d 987, 990 (7th Cir. 2002). Some courts refer to this as "*Garrity* immunity." See, *e.g.*, *People v. Haleas*, 404 Ill. App. 3d 668, 672-75 (2010).

¶ 71　　In *Kammerer v. Board of Fire & Police Commissioners of Lombard*, 44 Ill. 2d 500, 506 (1970), our supreme court distilled the meaning of this immunity, summarizing the United States Supreme Court's decisions in *Garrity* and *Gardner* as follows:

> "The net of these decisions, as we understand them, is that if a public employee
> refuses to testify as to a matter concerning which his employer is entitled to inquire,
> *he may be discharged for insubordination*, but if he does testify his answers may not
> be used against him in a subsequent criminal prosecution." (Emphasis added.)

19

¶ 72    The federal courts helpfully break this general concept into two: First, if an employer threatens adverse employment action for failure to answer, it then follows as a matter of law that the employee's statements and their fruits may not be used in subsequent criminal proceedings. This is best understood as the "application of *Garrity* immunity." (Internal quotation marks omitted.) *Sher v. United States Department of Veterans Affairs*, 488 F.3d 489, 503 (1st Cir. 2007). Second, having been afforded protection against self-incrimination by this immunity, the employee may be subject to adverse employment action if they remain silent. This is the "consequences of *Garrity* immunity." (Internal quotation marks omitted.) *Id.*

¶ 73    Although *Garrity* does not expressly describe what kind of immunity it bestows, our courts have put it on par with use and derivative-use immunity. *Haleas*, 404 Ill. App. 3d at 674-76 ("Because the use of compelled testimony in the *Garrity* context also directly implicates the individual's fifth amendment right against self-incrimination, we agree that the protections afforded by *Kastigar* are available to defendants whose statements have been suppressed under *Garrity*."). The federal circuits agree. See, *e.g.*, *Sher*, 488 F.3d at 501-02; *In re Grand Jury Proceedings*, 45 F.3d 343, 348 (9th Cir. 1995); *In re Grand Jury Subpoenas*, 40 F.3d 1096, 1102-03 (10th Cir. 1994).

¶ 74    As with the well-known *Miranda* rights that police must provide the suspect of a crime before questioning (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), employees who are being investigated are sometimes given "*Garrity* warnings" before an interrogation. The warnings are meant to inform them that the answers they give or the fruits thereof cannot be used against them in a criminal prosecution but that, if they refuse to answer questions, they may be punished by their employer, including being terminated. See, *e.g.*, *People v. Smith*, 399 Ill. App. 3d 534 (2010); *Haleas*, 404 Ill. App. 3d at 673-74.

¶ 75    Here, Scatchell received written *Garrity* warnings on January 9, 2018, immediately before he was interviewed by Village investigators about his possible misconduct. Scatchell signed the written warning sheet, then answered the investigator's questions. Once the Village formally charged him with misconduct, the matter proceeded to a hearing before the Board.

¶ 76    On October 22, 2018, the Village announced its intention to call Scatchell to the stand, as it had the previous April when the hearing initially commenced before a continuance. In the presence of the Board and Scatchell (with counsel present), the Village called Scatchell to the stand and acknowledged that the warnings he was given in January still applied. Scatchell's counsel argued, however, that *Garrity* did not apply at the administrative hearing and informed the court that Scatchell would not take the stand. When Deputy Chief Castellan ordered him to testify, Scatchell asserted his fifth amendment right and refused to testify. This refusal to testify, as noted earlier, led to the amended charge of insubordination.

¶ 77    Before us, Scatchell claims that he was fired not for insubordination but for asserting his fifth amendment right, placing him in *Gardner*'s protective ambit. But he misreads *Gardner*. It is true, as he argues, that *Gardner* stands for the proposition that a police officer may not be fired solely for asserting his fifth amendment right against self-incrimination. But *Gardner* involved a scenario where that was precisely the situation the officer faced: he was ordered to both testify *and* waive any immunity for testifying, at the risk of losing his job if he refused to do either. See *Gardner*, 392 U.S. at 274, 278. In other words, he was forced to testify *without* the protections afforded by *Garrity*, leaving him with the "Hobson's choice" (*id.* at 277) of answering questions that could be used against him in a criminal prosecution, on the one hand, or losing his job, on the other. The Supreme Court refused to allow this end-run around *Garrity* protection.

¶ 78    That is not what happened here. Neither the Board nor the Village ordered Scatchell to waive his *Garrity* immunity; to the contrary, they repeatedly told him that he would be protected by *Garrity* immunity and thus had no fear of self-incrimination if he testified before the Board. Scatchell's right against self-incrimination was never in doubt; it remained intact because of the immunity afforded him. That, obviously, is the very point of the use or derivative-use immunity provided by *Garrity*—to compel officers to truthfully answer questions about their conduct without the fear that the testimony will be used against them in a criminal prosecution. Scatchell, then, was found insubordinate because he refused to answer conduct-related questions even after receiving immunity, just as a witness in a criminal case could be punished for contempt for refusing to testify after being given immunity for that testimony. See, *e.g.*, *People v. McPherson*, 2018 IL App (2d) 170966, ¶ 23.

¶ 79    Scatchell insists that *Garrity* immunity did not attach for various reasons. For one, he argues without citation, as he did below, that "it is unclear whether *Garrity* immunity applies at the administrative hearing level." We are not sure why he finds this question unclear; our supreme court's seminal decision on this issue, *Kammerer*, concerned an officer's refusal to answer substantive questions at a hearing before the village board of fire and police commissioners, just as here. See *Kammerer*, 44 Ill. 2d at 501, 504-05.

¶ 80    Scatchell also complains that the *Garrity* warnings afforded him were inadequate to begin with (when he was originally questioned) and were not re-stated at the hearing. But *Garrity* is self-executing, attaching as a matter of law when a police officer is ordered by his public employer to answer questions about his conduct that could incriminate him. See *Blunier v. Board of Fire & Police Commissioners of Peoria*, 190 Ill. App. 3d 92, 104 (1989) ("[*Garrity*] use immunity attaches automatically as a matter of law and the statements cannot be used,

regardless of whether immunity has expressly been granted."); *Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation of New York*, 426 F.2d 619, 626 (2d Cir. 1970) ("[T]he very act *** in telling the witness that he would be subject to removal if he refused to answer was held to have conferred such immunity."); *United States v. Veal*, 153 F.3d 1233, 1239 n.4 (11th Cir. 1998) (noting that *Garrity* immunity "is Supreme Court-created and self-executing; it arises by operation of law; no authority or statute needs to grant it"), *overruled in part on other grounds by United States v. Chafin*, 808 F.3d 1263 (11th Cir. 2015); *Gulden v. McCorkle*, 680 F.2d 1070, 1075 (5th Cir. 1982) (under *Garrity*, "It is the very fact that the testimony was compelled which prevents its use in subsequent proceedings, not any affirmative tender of immunity.").

¶ 81    We could imagine a scenario where an officer, without counsel, might face questioning from his employer and not understand that he is protected by *Garrity*; after all, most everyone knows about the right against self-incrimination, but fewer know about *Garrity* immunity. We could imagine a scenario where an individual might not know that his testimony would be immunized and thus would assert the fifth amendment without realizing his or her full panoply of rights, leading to his or her termination. See *Atwell*, 286 F.3d at 990 (noting that unrepresented individuals, unaware of *Garrity* immunity, "may instinctively 'take the Fifth' and by doing so unknowingly set themselves up to be fired without recourse"). That scenario might raise other questions of fairness and even constitutional concerns.

¶ 82    But that scenario is not before us. Scatchell was represented by counsel, and the question of *Garrity* immunity was the elephant in the room, the topic that dominated the first October hearing, forcing an adjournment so that the parties could brief the issue, followed by more argument on this topic when the parties reconvened. Scatchell could not possibly complain that he was caught off-guard or unaware of the issue, even if his lawyer's stated understanding of

*Garrity* was incorrect.

¶ 83    Simply put, Scatchell was not given the choice between keeping his job or making statements that could be used against him in a criminal prosecution, like the officer in *Gardner*. He was given the choice between truthfully answering questions while enjoying immunity from the use of his answers, on the one hand, versus refusing to testify (even though given immunity) and facing the job-related consequences for doing so, on the other. He chose the latter. The Board properly followed the law, and its factual finding that Scatchell disobeyed the deputy chief's direct order was not against the manifest weight of the evidence. We uphold the Board's decision on this charge.

¶ 84                               B. Cause for Termination

¶ 85    Having upheld the Board's findings on all but one of the eight charges under review, we next determine whether those findings provide a sufficient basis for the Board's conclusion that cause existed to terminate Scatchell. *Siwek*, 374 Ill. App. 3d at 737-38.

¶ 86    Cause is "some substantial shortcoming which renders the employee's continuance in office in some way detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good cause for his no longer holding the position." (Internal quotation marks omitted.) *Department of Mental Health & Developmental Disabilities v. Civil Service Comm'n*, 85 Ill. 2d 547, 551 (1981). In our review, "we may not consider whether we would have imposed a more lenient disciplinary sentence"; instead, our review "is limited to a determination of whether the Board acted unreasonably or arbitrarily by selecting a type of discipline that was inappropriate or unrelated to the needs of the service." *Krocka*, 327 Ill. App. 3d at 48.

¶ 87    The record amply supports the Board's conclusion that Scatchell's behavior was

24

tantamount to cause to fire him. In fact, many of Scatchell's individual violations alone would have been enough to establish cause supporting his termination.

¶ 88      Police departments, as paramilitary organizations, require disciplined officers to properly function, and it is appropriate for those departments to punish officers who violate rules, regulations, or orders. *Siwek*, 374 Ill. App. 3d at 738. The Board concluded that Scatchell abused the department's sick time policy by going hunting while on leave to heal an injury to his neck and arm. While there was conflicting evidence about how much recoil a shotgun could create, the Board was in the best position to decide if Scatchell risked aggravating his injury, and they concluded he did.

¶ 89      Further, Scatchell engaged in a business with Scavo, moonlighting as a hunting guide without the department's approval. Whether Scatchell thought himself an "employee" is ultimately irrelevant; the Board concluded that he was involved in the business without having sought the required approval to be. That alone has been enough to terminate someone in a similar position before. See *Weisenritter v. Board of Fire & Police Commissioners of Burbank*, 67 Ill. App. 3d 799, 802 (1978) (affirming dismissal of firefighter who engaged in outside employment without department's consent). Violating the Department's polices on moonlighting and sick leave is detrimental to the discipline and efficiency of the service and ample cause to terminate Scatchell.

¶ 90      But more egregiously, Scatchell not only went hunting with a shotgun—he went with a man he knew was a convicted felon. Then, caught red-handed, he was less than forthcoming to Bergland, the conservation officer, saying that he could not say "one way or the other" if he saw Scavo shooting a gun. He said the same thing to investigators who interviewed him about the incident later. Bergland thought Scatchell was lying, and ultimately so did the Board. We have

previously held that an officer who lies to his employer can be discharged. See *Slayton v. Board of Fire & Police Commissioners of Streamwood*, 102 Ill. App. 3d 335, 338-39 (1981). The key factor is the matter of the lie and, more specifically, how it directly relates to a police officer's duty to the public. *Kupkowski v. Board of Fire & Police Commissioners of Downers Grove*, 71 Ill. App. 3d 316, 324 (1979).

¶ 91      Police officers, as guardians of the laws, are expected to act with integrity, honesty, and trustworthiness. *Sindermann v. Civil Service Comm'n of Gurnee*, 275 Ill. App. 3d 917, 928 (1995). But Scatchell's actions here are devoid of all three. While the Board recognized that he had a close relationship with Scavo, that does not change the fact that Scatchell knew Scavo was a felon and could not have a gun. Despite that, Scatchell took Scavo hunting with him in his boat. That decision helped empower—at the least—Scavo's violation of the law. When Bergland caught and confronted Scatchell about it, he did not own up to his error in judgment.

¶ 92      If that were not enough, the nature of his false statements is extremely concerning. As an officer of the peace, it is his duty to enforce and uphold the law. Despite that duty, Scatchell started a business without permission and went hunting with a known felon while on paid sick leave. This was, as already discussed, disreputable. However, lying about it later to try to cover up a crime and his own misdeeds makes it inexcusable, and Scatchell acted in an irresponsible and dishonest manner. *Id.* at 929.

¶ 93      Last, there is Scatchell's refusal to testify. We have already explained he was mistaken when he believed he could assert his right to remain silent without fear of adverse job action. But our supreme court has also been clear that an officer who has criminal immunity but refuses to answer questions about his job performance "may be discharged for insubordination." *Kammerer*, 44 Ill. 2d at 506.

26

¶ 94    Scatchell emphasizes that he had served as an officer for six years without incident and continued to serve for an additional 11 months while this case was pending. But this was for the Board to consider; as noted, even if we were inclined to impose a more lenient sentence—which we need not decide—we only ask if the Board acted unreasonably or arbitrarily or if the type of discipline selected was inappropriate or unrelated to the needs of the service. *Siwek*, 374 Ill. App. 3d at 738. The decision to terminate Scatchell was neither unreasonable nor arbitrary, and we believe it was appropriate considering the nature and scope of Scatchell's misconduct.

¶ 95                    II. Department's Alleged Violations of Policies and CBA

¶ 96    Scatchell also claims the Department violated its own policies and the collective bargaining agreement (CBA) it had with his union, as well as levies several other procedural challenges. None, however, have any merit.

¶ 97    To begin, Scatchell contends that the investigation into his misconduct violated the Uniform Peace Officers' Disciplinary Act (50 ILCS 725/1 *et seq.* (West 2018)). When Scatchell was employed, the Act required that, prior to a peace officer being subject to an interrogation, anyone who filed a complaint against that officer must have the complaint supported by a sworn affidavit. *Id.* § 3.8. Since the anonymous note that Deputy Chief Castellan found in his office was unsworn, it could not be the basis of the investigation into his conduct, Scatchell believes.

¶ 98    The Uniform Peace Officers' Disciplinary Act requires that, if officers are to be disciplined, certain procedures must be followed. *Sherwood v. City of Aurora*, 388 Ill. App. 3d 754, 759 (2009). Section 3.8 requires that a person making a complaint against an officer sign a sworn affidavit verifying the contents of the complaint. 50 ILCS 725/3.8(b) (West 2018). However, this section only applies when "an officer *is subjected to an interrogation* within the meaning of this Act." (Emphasis added.) *Id.* § 3 (noting that sections 3.1 and 3.8 only apply

27

when officer is interrogated).

¶ 99    It does not apply in the situation here, where the anonymous tip prompted Melrose Park police to begin investigating Scatchell. See *Roman v. Cook County Sheriff's Merit Board*, 2014 IL App (1st) 123308, ¶ 98. Only after Bergland, the conservation officer, saw Scatchell hunting and shooting a shotgun with Scavo, a convicted felon, did investigators decide to question Scatchell. At the beginning of Scatchell's interrogation, he signed a warning that stated the Village was investigating Scatchell for being "involved in a situation where a felon was in possession of and used a firearm. We are conducting an investigation into the allegations that were reported to us." It was not the anonymous tip that prompted police to interrogate Scatchell; it was Bergland. Since Scatchell does not challenge Bergland's actions here, there was no violation of the Uniform Peace Officers' Disciplinary Act.

¶ 100    Scatchell also claims the investigation violated his constitutional rights because the department "never had reasonable suspicion" to justify an internal investigation. But this is easily discarded; the fourth amendment (which we presume Scatchell is trying to use, he does not specify) protects two types of expectations, one involving "searches," the other "seizures." See *Soldal v. Cook County*, 506 U.S. 56, 63 (1992). To "search" means to look for that which is concealed, thereby infringing upon someone's expectation of privacy. *People v. Raibley*, 338 Ill. App. 3d 692, 699 (2003) (citing *Soldal*, 506 U.S. at 63).

¶ 101    The department did not need to have "reasonable suspicion" to begin investigating Scatchell, because an investigation is not a search. Of course, an investigation may include a search and often does. But one is not the other. To the extent the department "searched" for anything, all Bergland did was look to see if Scatchell was hunting in an open area while he was on sick leave, only to find that he was—and with Scavo, a convicted felon. It is well established

that "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields." *Hester v. United States*, 265 U.S. 57, 59 (1924) (quoting U.S. Const., amend. IV); *Oliver v. United States*, 466 U.S. 170, 176 (1984).

¶ 102      Accordingly, we also decline Scatchell's suggestion to apply the exclusionary rule (*United States v. Calandra*, 414 U.S. 338, 347 (1974)) to this case. Even if there was a fourth amendment violation here (there is not), we have found no authority, and Scatchell has not cited any, where the exclusionary rule was applied in an administrative proceeding. To the contrary, the weight of precedent suggests the rule would not apply in these kinds of cases. See, *e.g.*, *Grames v. Illinois State Police*, 254 Ill. App. 3d 191, 199-201 (1993) (discussing cases and holding that exclusionary rule should not apply to officer misconduct proceedings: "The damage to the operation of an effective State Police force would far outweigh any benefit which would result from application of the exclusionary rule.").

¶ 103      Next, Scatchell alleges the investigation into his abuse of the department's sick leave violated the CBA between the Village and the Fraternal Order of Police lodge of which Scatchell is a member. He argues that section 5.3 of the CBA (which Scatchell has included in the appendix to his brief) does not allow any inquiries into an officer's sick leave until after the officer has been on leave for at least one month. Since the investigation into his abuse of the sick leave policy began before that 30-day clock ran, he suggests the whole investigation is void. However, the Board's authority—derived from statute—cannot be arrogated by a collective bargaining agreement. *Parisi v. Jenkins*, 236 Ill. App. 3d 42, 52 (1992). Even if the CBA applied here, it could not trump the Board's ability to investigate and adjudicate potential misconduct.

¶ 104      Scatchell also complains that the Department violated its standard operating

procedures during its investigation into his misconduct. But this argument is thrice forfeited; it was not raised before the Board or in the trial court, and before us, Satchell does not cite any evidence in the record that supports this argument. See *Keeling v. Board of Trustees of the Forest Park Police Pension Fund*, 2017 IL App (1st) 170804, ¶ 45 (party forfeits administrative review of issues and defenses not placed before administrative agency); *People v. Universal Public Transportation, Inc.*, 2012 IL App (1st) 073303-B, ¶ 50 (party that fails to cite pages in record in support of contentions in brief forfeits argument). "A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented [citation], and it is not a repository into which an appellant may foist the burden of argument and research [citation]; it is neither the function nor the obligation of this court to act as an advocate or search the record for error [citation]." *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993).

¶ 105                                III. Violation of Open Meetings Act

¶ 106       Next, Scatchell ask us to void the Board's decision because, he believes, the Board violated the Open Meetings Act (5 ILCS 120/1 *et seq.* (West 2018)). Section 2 of the act requires that meetings of public bodies be held in public, subject to certain exceptions. See *id.* § 2.

¶ 107       The record here reveals that, on December 4, 2018, the Board posted a public notice of a hearing on Scatchell's matter two days later, on December 6. The Board's written findings and decision to terminate Scatchell were entered on that date. However, there is nothing else in the record about what transpired at the December 6 meeting.

¶ 108       That also means, however, there is no indication the meeting was *not* open to the public. To prove it was not, Scatchell asks us to take judicial notice of a Freedom of Information Act (FOIA) (5 ILCS 140/1 *et seq.* (West 2020)) response from the Village, which he has attached to the appendix of his brief. That response indicates there were five pages of records relevant to

the request, but Scatchell has attached only the handwritten minutes of the meeting. Those minutes show the Board adjourned to executive session to discuss the charges against Scatchell. In his eyes, this proves the Board made the decision to terminate him privately, not publicly.

¶ 109      Rule 201 of the Illinois Rules of Evidence permit a court to take notice of "adjudicative facts." Ill. R. Evid. 201(a) (eff. Jan. 1, 2011). A judicially noticed fact must be one not subject to reasonable dispute, in that it must either be (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Ill. R. Evid. 201(b) (eff. Jan. 1, 2011).

¶ 110      The Administrative Review Law allows review of all questions of fact or law presented by the entire record. 735 ILCS 5/3-110 (West 2018). That said, the statute specifically limits judicial review to the administrative record, so we may not hear new or additional evidence in support of, or opposition to, the decision of the administrative agency. *Id.*; *Marconi*, 225 Ill. 2d at 532.

¶ 111      We cannot find any case, and Scatchell has not cited one, where a court took judicial notice of a FOIA response. Rather, the Village's FOIA response is the kind of "new or additional evidence" the law forbids us from considering in an administrative review case. *Robbins*, 177 Ill. 2d at 538. We also will not supplement the record on appeal with documents one of the parties has attached to their brief in the appendix with no stipulation between the parties or motion to supplement the record. See *Pikovsky v. 8440-8460 North Skokie Boulevard Condominium Ass'n*, 2011 IL App (1st) 103742, ¶ 16. Accordingly, we will not take judicial notice of the FOIA response when reviewing this claim.

¶ 112      Turning back to the question at hand, Scatchell has not established that the Board

violated the Open Meetings Act. The record reveals that a notice of the meeting was posted two days before it was held. The agenda included notice the Board would adjourn to a closed executive session to discuss a matter of employee discipline, which the Open Meetings Act allows it to do. See 5 ILCS 120/2(c)(1) (West 2018). Then the Board would reconvene in open session. The record suggests the meeting was open and, if Scatchell wanted to attend, he could. Moreover, the Board's final action was reduced to writing and signed by all three Board members.

¶ 113     If that was not enough, the Open Meetings Act grants courts wide discretion in deciding what relief, if any, is appropriate for a violation. *Id.* § 3(c). In other words, even if the Board *did* violate the act (and to be clear, we are not saying it did), it does not automatically mean the vote must be set aside. *Powell v. East St. Louis Electoral Board*, 337 Ill. App. 3d 334, 338-39 (2003). Even assuming the Board here had violated the act, Scatchell has not given us a sufficient reason to nullify its decision. See *Betts v. Department of Registration & Education*, 103 Ill. App. 3d 654, 664 (1981).

¶ 114                    IV. Claims of Procedural Violations at Hearing

¶ 115     Scatchell's next arguments are procedural in nature. For one, after the department rested its case against him, Scatchell moved for a directed finding of not guilty of all charges. The Board took the motion under advisement, and Scatchell presented evidence in his case. He now argues the Board should have ruled on his motion when he made it, because the Department had not established a *prima facie* case against him. The Board's refusal to rule prejudiced him, he claims, because it forced him to present a defense when, as a matter of law, he should have been acquitted.

¶ 116     Administrative hearings, like judicial proceedings, are governed by fundamental

principles and requirements of due process of the law. *Village of South Elgin v. Pollution Control Board*, 64 Ill. App. 3d 565, 567-68 (1978). However, an administrative hearing does not require the strict procedures of a judicial proceeding to satisfy due process. *Id.* at 568. Instead, administrative hearings may incorporate a form of procedure that is suitable and proper to the nature of the determination to be made and that conforms to the fundamental principles of justice. *Id.* That procedure must include impartial rulings on the evidence, an opportunity to be heard, and the right to cross-examine adverse witnesses. *Daniels v. Police Board of Chicago*, 338 Ill. App. 3d 851, 860 (2003).

¶ 117    As such, the Code of Civil Procedure does not apply to administrative proceedings. *Desai v. Metropolitan Sanitary District of Greater Chicago*, 125 Ill. App. 3d 1031, 1033 (1984). Administrative procedures are simpler and less formal and technical than judicial procedures. *Id.* The administrative body has broad discretion in conducting its hearings. *South Elgin*, 64 Ill. App. 3d at 568. An administrative agency abuses that discretion only when it acts arbitrarily or capriciously. *Village of Stickney v. Board of Trustees of the Police Pension Fund of Stickney*, 347 Ill. App. 3d 845, 852 (2004).

¶ 118    The Board's decision to take Scatchell's motion under advisement was well within its discretion, and that decision was not arbitrary or capricious. Its choice to wait until the evidence was complete was proper to the nature of this hearing, and the hearings conformed to the fundamental principles of justice and due process. It did not limit Scatchell's ability to plead his case or cross-examine adverse witnesses, and the Board acted impartially because it also took the Village's motion for a directed finding under advisement. We find no error here.

¶ 119    Along those same lines, Scatchell also claims the Board improperly allowed the Department to amend its charges and add count XIII, which alleged he was insubordinate and

33

disobeyed a direct order to testify in the hearing on October 22. On the hearing's next date, October 25, the Board allowed the Department to amend the complaint and add the additional charge.

¶ 120     In administrative hearings, due process of law specifically requires a definite charge, adequate notice, and a full and impartial hearing. *Ellison v. Illinois Racing Board*, 377 Ill. App. 3d 433, 444-45 (2007). That said, charges in administrative proceedings do not need to be as precisely worded as the pleadings in a judicial proceeding, provided the respondent is adequately advised of the charges so that he may intelligently prepare a defense. *Giampa v. Illinois Civil Service Comm'n*, 89 Ill. App. 3d 606, 610-11 (1980). And again, as the administrative body in charge of the proceedings, the Board had broad discretion to conduct its hearings as it saw fit, so long as the hearings satisfied due process concerns. *South Elgin*, 64 Ill. App. 3d at 568.

¶ 121     In *Giampa*, the respondent faced a charge from the Illinois Civil Service Commission related to sexual crimes against a minor. Before the administrative hearing, the hearing officer granted the Commission's motion to add a second charge, made three days before the hearing, for conduct unbecoming a state employee. *Giampa*, 89 Ill. App. 3d at 609. This court rejected the respondent's due process claim, as the second charge was based on the facts of the first incident and the respondent made no showing that he was unable to intelligently prepare his defense due to the lack of notice. *Id.* at 611.

¶ 122     Scatchell is in a similar position here. While the facts of count XIII were not based on the incident that gave rise to the other counts, he and his attorney were present for the events that precipitated the Department's allegations in count XIII. And he had plenty of time to intelligently prepare a defense to the charge; in fact, he filed a comprehensive memorandum of law on the topic, and the Board granted him a two-week continuance to prepare his case after the

additional charge was filed. Because he had ample time to prepare a defense and was aware of the conduct that underpinned the claim, any due process concerns were fully addressed.

¶ 123    In one last challenge to the administrative hearing, Scatchell argues that the Board erred when it refused to allow him to call Director Pitassi as a witness and further erred when it refused to allow him to make an offer of proof regarding Pitassi's anticipated testimony. Scatchell claims Pitassi was critical to his defense because he would testify to how the department treated other officers who violated department policies, thereby highlighting the "arbitrary and selective" enforcement of department polices to his detriment.

¶ 124    To his complaint that he was denied the opportunity to make an offer of proof in the moment, it ultimately does not matter. The purpose of an offer of proof is to disclose to the court and opposing counsel the nature of the offered evidence and to allow a reviewing court to determine whether that exclusion was proper. *Kim v. Mercedes-Benz U.S.A., Inc.*, 353 Ill. App. 3d 444, 451 (2004). The record is replete with Scatchell's filings highlighting what he contends were other incidents where Melrose Park police officers broke departmental policies. Based on his filings and his attorney's statement at the hearing, it is clear he intended to question Pitassi about these incidents. He adequately explained the nature of his proposed evidence for the circuit court and us to review, so any further offer of proof was unnecessary.

¶ 125    In any event, an officer may not hide behind the misconduct of others, which is irrelevant to whether that officer was guilty of misconduct. There may be sufficient cause to fire a particular officer in a case, regardless of whether other officers had received different treatment. See *Davis v. City of Evanston*, 257 Ill. App. 3d 549, 560 (1993). Even if Scatchell could prove he was treated differently—we take no position on that question—it is irrelevant to whether he broke the rules. As already noted, the Board has wide discretion in how it operates its

hearings, and it did not abuse it when it refused to allow Scatchell to question Pitassi on these topics.

¶ 126                                  V. Claims of Error by Circuit Court

¶ 127       Moving his complaints to the circuit court, Scatchell raises two arguments. First, Scatchell argues the trial court erred when it refused to allow him to amend the administrative law record. This is a bit of an end-around: his real grievance is that he believes the Board members engaged in improper *ex parte* communications with Pitassi, the police director, and Castellan, the deputy chief. These communications biased the Board against him, Scatchell believes, and denied him a fair hearing before an impartial board. See 65 ILCS 5/10-2.1-17 (West 2018) (Board must conduct fair and impartial hearing on charges). He sought to amend the administrative law record to present these claims, but the circuit court denied his efforts. That decision also scuttled his claim that the Board was biased.

¶ 128       We do not know why the circuit court denied Scatchell's motion to amend the administrative record; the transcript from the date of the hearing is not a part of the record. The circuit court denied Scatchell's motion to supplement the record on August 14, 2020, "for reasons stated on the record in Court." The circuit court also ordered Scatchell to file a copy of the transcript from the day's hearing with the clerk. That did not happen. (The record only contains the transcript of the August 18, 2020, hearing, where the parties argued on the administrative review complaint.)

¶ 129       It is well established that the appellant has the burden to present a sufficiently complete record of the proceedings in the trial court to support a claim of error. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). If the record is missing key pieces, we will presume that the order entered by the trial court conformed with the law and was supported by a sufficient

factual basis. *Id.* We resolve any doubts arising from the record's incompleteness against the appellant. *Id.* at 392. Here, the trial court's order denying leave to amend the record specifically referenced the findings it made at that hearing. Since Scatchell has not provided a transcript of that hearing to us—despite the circuit court order requiring him to—we will assume the court's order was amply supported by the facts and conformed to the law. We thus reject this challenge.

¶ 130    Next, Scatchell argues that the court abused its discretion when it refused to allow him to file an amended complaint. In the proposed amendment—which was more than 60 pages long—Scatchell alleged a complicated web of conspiracy and bias against him; he sought to add counts of retaliation and bias, as well as adding new parties to the suit. Among other things, he alleged the Department investigated him because his father filed a complaint against the Village, accusing it of racial discrimination.

¶ 131    First, some context on the timeline. The complaint for administrative review was filed in December 2018. Full briefing on the complaint was completed in December 2019. But he did not seek leave to file this amendment to the complaint until March 2020.

¶ 132    At any time before final judgment, parties may seek to amend their pleadings on "just and reasonable terms." 735 ILCS 5/2-616(a) (West 2020). To determine if the court abused its discretion when it refused to let Scatchell amend his complaint, we look at four factors: (1) whether the proposed amendment would cure a defective pleading, (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment, (3) whether the proposed amendment is timely, and (4) whether there were previous opportunities to amend the pleading. *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992). We will only reverse the trial court's decision if it manifestly abused its discretion. *Id.* at 273-74. A court abuses its discretion when no reasonable person would take the position the trial court adopted.

*Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 23.

¶ 133    The circuit court here directly addressed the *Loyola* factors, which makes our job easy. First, it concluded that the proposed amendment added new claims instead of curing defective ones. Needless to say, adding pages of new claims and allegations, often completely unrelated to the administrative proceeding underlying the initial action, is not curing existing defective claims. Second, the court found the amended complaint untimely since it was brought after briefing was complete on the initial administrative review complaint. And last, it concluded that adding new parties, claims, and arguments so late in the game would prejudice the existing defendants and those Scatchell sought to add to the case. There is nothing arbitrary or unreasonable about those conclusions.

¶ 134    The court also noted that Scatchell had tried—unsuccessfully—to bring most of his new proposed claims in other cases both in federal and state court. In February 2018, before the Board heard this case and terminated him, he filed a complaint in the circuit court of Cook County alleging that his rights were being violated.

¶ 135    Notably, in June 2018, Scatchell filed a complaint for injunctive relief to stop the Board proceedings, alleging, among other things, the Board's "lack of impartiality," based primarily on phone records showing conversations between the Board chair, the mayor, the police chief, the deputy police chief, and the Village attorney. That same month, he filed suit attacking the Board's jurisdiction to hear the charges at all. (This court eventually rejected that claim in *Scatchell v. Village of Melrose Park*, 2020 IL App (1st) 191414-U.) In January 2019, Scatchell then sought leave to join a federal civil rights lawsuit where his father was the plaintiff, though leave was denied.

¶ 136    As defendants here note, if Scatchell was citing phone records that he claimed

showed the Board's bias back in June 2018, the trial court could not possibly have abused its discretion in deeming untimely a proposed amendment to the administrative-review action, an amendment first submitted in March 2020—nearly two years later and only after full briefing on the administrative-review claims had been completed.

¶ 137    Though we could stop there, we also note another lawsuit filed originally in state court, before it was removed to federal court. On January 24, 2020, plaintiff filed suit in the circuit court of Cook County against the Board and other parties—a lawsuit that was then removed to federal court. See *Scatchell v. Village of Melrose Park*, No. 20 C 1045, 2021 WL 2291072, at *1 (N.D. Ill. June 4, 2021). The federal court, Judge Feinerman, stayed that case pending the outcome of the appeal under review here. *Id.* at *6.

¶ 138    In granting the stay, Judge Feinerman repeatedly emphasized that the claims raised in the federal action mirrored the claims that Scatchell sought to raise in his proposed amendment to the administrative-review complaint. See, *e.g.*, *id.* at *1 (noting that "Scatchell moved to amend his complaint in the administrative review action to add (1) the defendants (Serpico and Caira) named in this suit but not in the administrative review action and (2) the federal and state claims asserted in this suit"); *id.* at *6 (noting "Scatchell's ongoing effort to add to the administrative review action the claims he brings in this suit").

¶ 139    At oral argument before us, Scatchell argued that a grave injustice will occur if he is not allowed to amend his complaint for administrative review to include these federal claims, that he will never have his day in court, so to speak, over these claims of bias. We have trouble accepting this argument for several reasons.

¶ 140    For one, Scatchell could have made this administrative-review action his original forum for raising these claims. He could have raised them when he filed his original

administrative-review complaint; as noted above, he was raising claims of bias as early as June 2018. But he did not. Instead, he first tried federal court—joining his father's lawsuit—and then filed another action in state court raising these claims, the one that was removed to federal court, now pending before Judge Feinerman. That case contains all the same claims Scatchell wishes to add in his proposed amendment to this administrative-review action. Indeed, that was the principal reason Judge Feinerman stayed the federal action until we decided this appeal. See *id.* at *3 ("if the state appellate court reverses the state trial court's order denying Scatchell leave to amend, all claims in the present lawsuit will become part of the administrative review action").

¶ 141    True, defendants are challenging that federal action with arguments of claim-splitting (see *id.* at *1, *6), and Scatchell would like to at least try to avoid that problem by simply amending the administrative-review complaint here. But the fact remains that Scatchell will have his "day in court" on these claims of bias—federal court, before Judge Feinerman. Whether he prevails certainly cannot be the decisive factor for us.

¶ 142    Given that the claims of bias, so heavily emphasized by Scatchell at oral argument, were the basis of a lawsuit as early as June 2018 and considering that the very claims and parties that Scatchell tried to add in his amendment to the administrative-review complaint are pending before Judge Feinerman, we could not possibly find that the court abused its discretion in deeming the proposed amendment untimely, nor do we find that any prejudice or injustice to Scatchell would occur. We find no error in the court's denial of leave to amend.

¶ 143                                CONCLUSION

¶ 144    The judgment of the circuit court, affirming the final decision of the Board, is affirmed.

¶ 145    Affirmed.

---

### *Scatchell v. Board of Fire & Police Commissioners for Melrose Park*, 2022 IL App (1st) 201361

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CH-16150; the Hon. Pamela McLean Meyerson, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Gianna R. Scatchell and Cass T. Casper, of Disparti Law Group, P.A., of Chicago, and Christopher Cooper, of Law Office of Christopher Cooper, Inc., of Griffith, Indiana, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Jeffrey S. Fowler, of Laner Muchin, Ltd., and Patrick H. O'Connor, of Hartigan & O'Connor P.C., both of Chicago, for appellees. |

---