**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220059-U

Order filed June 28, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| PAUL BERGE, | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| Plaintiff-Appellant, | ) | Kankakee County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-22-0059 |
| | ) | Circuit No. 21-MR-133 |
| | ) | |
| KANKAKEE POLICE CHIEF FRANK | ) | |
| KOSMAN, THE BOARD OF FIRE AND | ) | |
| POLICE COMMISSIONERS OF THE CITY | ) | |
| OF KANKAKEE, DR. WILLIE DAVIS, | ) | |
| NICKEY YATES, MARIO FLORES, | ) | |
| CORTNEY BESSART, and DAWN | ) | |
| LANDWEHR, | ) | Honorable |
| | ) | Brenda Claudio, |
| Defendants-Appellees. | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Justices Brennan and Peterson concurred in the judgment.

_____

**ORDER**

¶ 1      *Held*: We affirm the Board's decision to terminate plaintiff's employment with the Kankakee Police Department, rejecting plaintiff's arguments that (1) the administrative proceeding violated his due-process rights, (2) the Board's decision was not against the manifest weight of the evidence, and (3) his termination violated his first amendment right to free speech.

¶ 2 On December 1, 2020, defendant, the Board of Police and Fire Commissioners of the City of Kankakee (Board), terminated plaintiff Sergeant Paul Berge's employment with the Kankakee Police Department. The disciplinary proceedings concerned allegations that Berge was insubordinate to his superiors on July 15 and 18, 2020, and lied during a July 30, 2020, formal interrogation regarding the alleged insubordination. Berge sought judicial review of the Board's decision under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2020)), naming as defendants (now former) Chief Frank Kosman, the Board, and its members. The circuit court affirmed the Board's decision.

¶ 3 Berge now appeals to this court, contending (1) he did not receive a fair and impartial hearing before the Board, in violation of his procedural due-process rights, (2) the Board's findings that he violated department policies and those violations were cause for termination were against the manifest weight of the evidence, and (3) his termination violated his first amendment rights. We reject Berge's contentions and affirm the circuit court's judgment.

¶ 4 I. BACKGROUND

¶ 5 A. The Kankakee Police Department

¶ 6 The Kankakee Police Department is a law enforcement agency with 68 officers. Per its written policy manual, the department is a paramilitary organization and has the following ranking hierarchy and chain of command, from most to least superior: (1) chief, (2) deputy chief, (3) commanders, (4) lieutenants, (5) sergeants, and (6) patrol officers. A superior officer may issue directives, commands, or orders to lower-ranking officers, who must follow any such directive, command, or order unless it is unlawful.

¶ 7 B. Investigation into Berge's Conduct on July 15 and 18, 2020

2

¶ 8    On July 20, 2020, Chief Kosman, placed Berge on administrative leave, pending an investigation into events that occurred on July 15 and 18, 2020. In a July 20 letter to Berge, Kosman told Berge the investigation's purpose was to determine whether Berge "committed acts of insubordination by refusing to obey lawful orders from persons of superior rank in violation of [sections] 200.3.3B and 341.3.5.F of the [policy manual]."

¶ 9    On July 24, 2020, Deputy Chief Willie Hunt issued to Berge a notice of interrogation. In pertinent part, the notice stated the interrogation's purpose was to determine whether Berge (1) violated the department's rules, regulations, or procedures "with respect to the performance of [his] duties, failure to follow commands and orders, and insubordination while on duty on July 15, 2020[,] and July 18, 2020"; and (2) "fully and accurately reported [his] activities with respect to [his] work as a Kankakee Sergeant."

¶ 10    On July 30, 2020, Berge appeared for his interrogation and stated he understood the interrogation's purpose was to determine whether he failed to follow commands or orders or was insubordinate on July 15 and 18, 2020. Berge was asked about a conversation he had with Commander Donnell Austin in the sergeants' office on July 15 and his presence at a public protest on July 18. Berge stated that, on July 15, Commander Austin placed his foot on Berge's desk and thrusted his crotch into Berge's face, which Berge believed was sexual harassment.

¶ 11                                  C. Disciplinary Charges

¶ 12    On August 13, 2020, Chief Kosman filed a three-count disciplinary charge against Berge, seeking Berge's termination. In count I, Kosman alleged that, on July 15, 2020, Berge (1) failed to answer questions posed to him by Commander Austin regarding an assigned task of the patrol unit, (2) physically confronted and was verbally abusive and disrespectful to Commander Austin, and (3) "failed to follow multiple direct orders from Commander Austin." In count II, Kosman

alleged that, on July 18, 2020, Berge (1) failed to acknowledge Chief Kosman at a public protest, (2) failed to follow Kosman's direct orders, and (3) was insubordinate to Kosman. Kosman asserted Berge's conduct toward Austin and Kosman violated sections 200.3, 200.3.1, 200.3.3, 341, and 341.3.5 of the department's policy manual.

¶ 13       In count III, Kosman alleged that Berge made false statements during his formal interrogation, specifically, Berge (1) "denied seeing Kosman when he arrived at the public protest," (2) "denied hearing Kosman's direct order(s)," (3) "denied brushing off *** Kosman as he walked away from *** Kosman," (4) "denied being insubordinate to his superiors" on July 15 and 18, 2020, and (5) "stated he had a lawful reason to disregard the orders given to him." Kosman alleged Berge's statements were "intentional falsehoods" to avoid discipline for the matters alleged in counts I and II, and Berge's untruthfulness constituted cause for termination.

¶ 14                     D. Berge's Motion for a Bill of Particulars

¶ 15       Before the hearing on the disciplinary charges, Berge moved for a bill of particulars, citing section 2-607 of the Code of Civil Procedure (Code) (735 ILCS 5/2-607 (West 2020)). He asserted the disciplinary charges "fail[ed] to identify with particularity what conduct form[ed] the basis for the various counts of each rule violation." He sought an order requiring Chief Kosman to specifically identify (1) the direct orders from Commander Austin he failed to follow, (2) the direct orders from Chief Kosman that he failed to follow, and (3) the acts establishing his insubordination to Chief Kosman. He also asked the Board to strike three of count III's alleged false statements and sought more specific information regarding all five alleged false statements.

¶ 16       Kosman responded the Code did not apply in proceedings before the Board. Further, Berge had received all the evidence that would be used during the hearing, a transcript of his interrogation, and copies of the department policies he was alleged to have violated. Kosman

4

contended the written charges, together with the information furnished to Berge, put him on notice of the charges against him and allowed him to prepare a defense.

¶ 17                                    E. The Board Hearing

¶ 18        The disciplinary hearing was held on multiple nonconsecutive days, beginning on September 15, 2020, and ending on December 1, 2020. Before hearing evidence, the Board heard arguments on and Berge's motion for a bill of particulars. The Board deliberated in an open session and denied the motion. The parties agreed to bifurcate the proceedings, first presenting evidence on whether Berge violated the policy manual.

¶ 19                                    1. *Kosman's Evidence*

¶ 20                                    a. Commander Austin

¶ 21        On July 15, 2020, Commander Austin spoke with Deputy Chief Hunt about an email Hunt had received the day before from an alderwoman. In the email, the alderwoman told Hunt and the city's code enforcement officer that she had received "some complaints lately about people hanging out in front of [an] old funeral home on the corner of Hickory and Dearborn[,] [d]rinking alcohol and really getting comfortable." She also said she received a complaint on July 13 that people were inside the funeral home. The alderwoman asked Hunt and the code enforcement officer to have someone check on the property to make sure it was vacant and secure.

¶ 22        Later that morning, Austin spoke to Berge, who was the acting shift commander for the day. Austin asked Berge to ensure someone checked on the funeral home. A couple hours later, Austin called Berge and told him to make sure somebody checked the funeral home and, if any persons were seen violating city ordinances, to issue appropriate citations. Berge did not object to Austin's request at the time.

5

¶ 23    Around 1:35 p.m., Austin went to the sergeants' office to speak with Berge. The sergeants' office has a three- or four-foot window that looks out into the adjacent squad room. The door was open when Austin entered the office. He was calm and inquisitive, not upset or angry. Austin had heard radio traffic that officers had been to the funeral home but did not know what had occurred. Sergeant Gary Tison[1] and Berge were sitting at their desks. Berge was leaning back in his chair with his eyes closed, feet on the desk, and "hat kicked back."

¶ 24    Austin twice called out to Berge. After the second time, Berge opened his eyes and looked diagonally, away from Austin. To get Berge's attention, Austin waved his hand in Berge's line of sight. Austin looked at Tison, who said, "something is wrong with [Berge]." Berge appeared "sleepy or groggy," blinked his eyes several times, and shook his head. Austin stood in front of Berge's desk, tapped on it, and asked Berge if he was okay. Berge "said something that was kind of incoherent." Austin asked Berge, "Did we go by that address and did we do anything?" In response, Berge asked Austin, "What address? What are you talking about?" Austin replied that he had asked Berge to make sure someone went to the funeral home. Austin asked Berge what had been done. Berge asked, "Why? What's the problem?" Austin responded, "We've got [an alderwoman] and people calling us saying go check this address." Berge asked, "What [alderwoman]? Who?" Austin responded, "It doesn't matter which [alderwoman] it is. The citizens are contacting the [alderwoman] and the [alderwoman is] calling us to go check on this address." Berge asked, "What citizens? Who called?" According to Austin, he remained calm throughout this interaction while Berge was rude, dismissive, and evasive. Austin denied, at any point, placing his foot on Berge's desk and thrusting his crotch toward Berge's face.

_____

[1]Tison's name is also spelled "Tyson" in the record.

¶ 25    Berge stood up as he questioned Austin, and Austin backed away from the desk. Berge came around the desk, got within a foot of Austin, and berated him. Berge asked Austin what he had "done for the department" in Austin's three years as the patrol commander. Berge also said, "This is not your department, this is our department, [and] we're going to take our department back." Berge continued, "You can ask anybody. You can ask those [officers] out [in the squad room]. You can ask the citizens in the street. You don't know how to do your job." Austin believed Berge was being insubordinate and questioning his authority.

¶ 26    At some point during the conversation, a phone rang in the sergeants' office. Berge answered the phone, which was one of his normal duties. Berge told Austin a records clerk was on the phone and began conversing with the clerk. Austin directed Berge to hang up, but Berge continued the call. Austin repeated his order four times, telling Berge he could call the clerk back after Austin and Berge finished their conversation. Berge did not hang up. Austin disconnected the call and told Berge he was relieved of duty for the day, to gather his belongings, and to leave the police department. Berge did not do so.

¶ 27    Austin and Berge's conversation occurred during a shift change, while 12 to 15 officers were in the squad room. Austin agreed he and Berge's voices were raised and believed the conversation could be heard and seen from the squad room.

¶ 28    At some point during this confrontation, Tison left the sergeants' office to conduct a preshift meeting. Sergeant Timothy Klopp came into the office to speak with Austin and Berge.

¶ 29    After he dismissed Berge, Austin reported to Chief Kosman and Deputy Chief Hunt that he had dismissed Berge for being insubordinate. He began preparing a memorandum about the incident, which he completed and sent to Kosman the next day. In his memorandum, Austin wrote that, after his conversation with Berge, he spoke with a patrolman who checked on the funeral

7

home. The patrolman reported individuals at the funeral home were found drinking and were told to pour out their alcohol. Austin also wrote he believed Berge may have been intoxicated or tired. On cross-examination, Austin said he did not smell alcohol on Berge's breath and did not investigate whether Berge was, in fact, intoxicated. He made the statement based on Berge's behaviors, including his incoherence and agitation. Additionally, Austin stated he was aware Berge was previously alleged to have been insubordinate to a minority supervisor in October 2019. Austin had seen the report but also knew the allegations were determined to be unfounded. Austin believed Berge's insubordination was a trend with minority officers. None of the other officers who testified, however, had any basis to believe Berge was prejudiced against minority superiors.

¶ 30        Austin could not provide the department policy's definition of insubordination verbatim. He believed insubordination included the failure to follow direct orders of and disrespectful conduct toward a superior officer. However, Austin reviewed the definition before submitting his memorandum and cited the applicable policy.

¶ 31                                b. Sergeant Tison

¶ 32        Sergeant Tison was sitting in the sergeants' office with Berge when Commander Austin entered. Austin came into the room to ask about a call from earlier in the day. He stood in the doorway, did not appear excited or angry, and was not yelling and screaming. Austin called Berge's name a couple times and asked what had happened on the call. Berge did not respond to Austin but instead mumbled something Tison could not discern. Tison looked at Berge, who had his feet on the desk and eyes closed, and did not know whether Berge was asleep. Tison called out to Berge and asked if he was okay. Berge responded to Tison, "I'm fine. Just a little tired." Austin again asked Berge what had happened on the call, and Berge did not respond.

8

¶ 33    Tison was present when Berge answered the telephone. After Berge answered, Austin told Berge their conversation was not over and gave him a direct order to hang up the phone. Berge did not hang up and told Austin, several times, "to get out of the office." Austin told Berge he was relieved of his duties. Berge did not gather his belongings or leave at that time.

¶ 34    Tison then left the sergeants' office to conduct the preshift meeting. Berge was still seated at his desk. As he walked to the podium in the squad room, Tison told Sergeant Klopp, the police union's vice president, "You might want to go in there and just mediate, make sure everything is okay in there." At the podium, Tison saw that Berge had moved from his desk and was standing approximately one foot from Austin.

¶ 35    Tison was present in the office for approximately five minutes. He never saw Berge threaten Austin but believed Berge was disrespectful when he told Austin to leave the office. Tison never saw Austin put his foot on Berge's desk or thrust his crotch in Berge's face.

¶ 36                                    c. Sergeant Klopp

¶ 37    Around 1:44 p.m., Sergeant Klopp walked into the sergeants' office. Berge, Austin, and Tison were inside the office. Klopp left after about 30 or 45 seconds. He shut the door when he left, because Austin and Berge were having a louder-than-normal conversation. He did not want their conversation to disrupt the preshift meeting and also wanted Austin and Berge to have some privacy. Berge was seated when Klopp left.

¶ 38    Klopp walked to the podium and reviewed some documents. Less than two minutes later, Tison walked up to the podium and suggested that Klopp go back to the sergeants' office "because it was getting a little heated" and Berge "might need a [union] rep[resentative]."

¶ 39    Klopp approached the office and saw, through the window, Austin and Berge standing within a foot of each other "right inside th[e] window." He "could hear very loud talking at that

9

point" through the closed door, but he could not discern what was being said. Klopp entered the office and stood between the two desks, "trying to sort of figure out what was going on." Klopp heard Berge ask Austin, "What have you done for your guys the last three years?" Austin replied, "What are you talking about?" Both men were "ticked off," and the exchange was growing louder and more intense. Klopp believed the exchange had the potential to turn physical. Thus, Klopp interjected, asking Austin and Berge to step away from each other and reduce the intensity of their exchange. Berge sat back down at his desk. Austin told Berge he had been dismissed and gave Berge a direct order to go home.

¶ 40 Berge did not acknowledge Austin's order. Instead, he sat quietly for 30 to 60 seconds. Klopp told Berge that Austin had given him a direct order and suggested he should go home for the day and take up the discussion on another day. Berge thought for a second, told Klopp he was right, grabbed some belongings, and left. Klopp never had reason to suspect Berge was intoxicated or drunk.

¶ 41                                    d. Chief Kosman

¶ 42 Chief Kosman became chief in May 2019. On July 15, 2020, Austin reported to Kosman that he attempted to have a discussion with Berge about a call and Berge became confrontational. Austin further reported he asked Berge to come to his office, so they could speak in private, and Berge told Austin to "get out of the sergeants' office." Austin told Kosman he had dismissed Berge for insubordination. Berge was scheduled to be off work on July 16 and 17.

¶ 43 On Saturday, July 18, 2020, a preplanned protest march occurred in downtown Kankakee. Approximately 15 or 20 citizens, some of whom were young children, participated. Before the march, Kosman determined that he, Sergeant Paul Miller, and patrol officer Marcy Gearhart would

10

assist with maintaining peace during the march. Kosman believed three officers would be sufficient. If more help was needed, Kosman could call more patrol officers.

¶ 44    The protesters marched several blocks from Bird Park to the courthouse. Along the march route, Kosman observed Berge standing in an alley. Berge had not been assigned to the march detail. It was possible Berge heard a radio request for assistance with traffic. However, Kosman did not see Berge assist in any way with traffic.

¶ 45    The march moved along and Kosman observed Berge a second time. This time, Berge was sitting on a half wall at an intersection, swaying back and forth and kicking his feet. Kosman did not assign Berge to that location. Kosman did not hear Berge say anything to the protesters.

¶ 46    The march moved to the courthouse. Kosman parked his squad car on the courthouse's east side. Sergeant Miller parked behind him. As Kosman sat in his car, he saw Berge walking through a grassy area toward the protesters in front of the courthouse. Kosman exited his car and yelled an order at Berge, who was about two car lengths away, to stop and return to his car. He did not want Berge or any officer to be intermingled with the protesters. Kosman had to repeat his order several times, and the last time, he said, "I'm giving [you] a direct order to go back to [your] car and leave." Kosman walked toward Berge as he gave these orders, and Berge stopped and looked toward Kosman. Berge waved his right arm downward in Kosman's direction, which Kosman interpreted as Berge waving him off. Berge turned and began walking toward the protesters. Astounded, Kosman turned to Sergeant Miller, who was seated in his squad car, and asked if he had just seen what happened. Miller told Kosman he had not been watching. Kosman told him that Berge had just disobeyed his order to leave the area. Miller said he would go talk to Berge.

¶ 47    Miller approached Berge, who was now near the marchers. A short time later, Berge walked back toward his vehicle, and Kosman spoke to him about Berge having approached the

11

march despite his order not to. Kosman told Berge he had been dismissed for the day and to report to his office Monday morning. Berge did not immediately leave the area. Instead, he told Kosman he did not have to follow unlawful orders, and Kosman's order was unlawful because Berge merely wanted to speak with the children. Kosman responded that his order was not unlawful and again told Berge to leave. Berge told Kosman he "was a poor leader." Kosman told Berge he had never witnessed such insubordination in his 34 years of experience. Berge said, "maybe it was time for [Kosman] to retire." Kosman replied, "Maybe it's time for [you] to find another job."

¶ 48       Kosman called Lieutenant Robin Passwater, the on-duty shift commander, to the scene after Berge disobeyed his first order. When Passwater arrived, Kosman told Passwater what had happened. Kosman again directed Berge to go back to the station, drop off his gear, go home for the day, and return to his office on Monday morning. Berge again did not leave and instead asked Passwater what he should do. Passwater told Berge to listen to Kosman's order. Berge left immediately after speaking with Passwater.

¶ 49       On July 20, 2020, Berge appeared in Kosman's office as directed. Kosman delivered to Berge a letter informing Berge he had been placed on administrative leave. Believing there may have been video footage of his interaction with Berge on July 18, Kosman contacted the Kankakee County Sheriff's Office, which maintains several cameras around the courthouse. Kosman received a flash drive with video footage, which showed four different views of the courthouse lawn on July 18, 2020. The footage was admitted into evidence and played for the Board.

¶ 50       We have viewed the footage, which contains no audio. The footage shows Chief Kosman and Sergeant Miller park their vehicles on the east side of the courthouse as the march approaches the stairs on the north side of the courthouse. Moments later, Berge parks his vehicle on the southeast corner of the courthouse, in a half-circle drive. Berge exits, walks around the rear of his

12

vehicle, and begins walking through the lawn toward the north side of the courthouse. After taking several steps, Berge briefly turns toward Kosman's and Miller's vehicles, puts out his right hand at about waist height, and then continues walking around a stone monument, toward the marchers. He then turns back toward Kosman's vehicle and walks a few steps in Kosman's direction as Kosman exits his vehicle. Berge again puts out his right hand at about waist height, stops walking, and leans toward Kosman with both arms out at his waist. Kosman begins walking toward Berge, and Berge leans in further with his arms at his side. Kosman stops on the sidewalk and points to Berge's vehicle with his left hand. Berge extends his right hand out, waves it once in a downward motion, and walks to the north side of the courthouse. As this is happening, a citizen appears to be watching the interaction. Kosman begins to follow Berge but turns back to his vehicle. Miller then approaches Berge and they appear to have a conversation, during which Berge is animated. Berge turns and waves to the marchers, and Miller shepherds him toward Kosman. Berge then walks back to his vehicle, without stopping as he walks past Kosman. Kosman follows Berge to Berge's vehicle. Berge walks around his vehicle's rear, toward the driver's side door. He then stops and interacts with Kosman. About three minutes later, Lieutenant Passwater arrives. After about 30 more seconds, Berge gets in his vehicle and drives away.

¶ 51    After reviewing the video footage and the memoranda concerning the July 15, 2020, incident, Kosman set up a formal interrogation to investigate Berge's conduct. Berge was placed under oath for the interrogation and was expected to give truthful and honest answers to the questions posed. Kosman identified three instances in which he believed Berge gave an untruthful response during his interrogation. First, Berge answered "No, sir[,]" when asked whether he saw Chief Kosman upon exiting his vehicle at the courthouse. Second, Berge answered "No, sir[,]"

13

when asked whether he heard Kosman make any statements or call out to him at that time. Third, Berge answered "No, sir[,]" when asked whether he waved off Kosman at that time.

¶ 52 Kosman stated he filed charges seeking Berge's termination "because of the insubordination," explaining "[i]t would be difficult to manage a police department if *** subordinates do not follow the lawful *** orders of superior officers." He also stated Berge's untruthfulness during his interrogation was concerning because an officer's untruthfulness could negatively affect the officer's credibility if the officer had to testify in a future criminal case.

¶ 53 On cross-examination, Kosman agreed the marchers were at times chanting loudly but did not believe the marchers were loud enough to affect Berge's ability to hear him. Kosman did not know if there was radio traffic when he ordered Berge to leave the area. Kosman acknowledged it was "not optimum" that Austin collected memoranda from the officers who witnessed the July 15, 2020, incident, given Austin's personal involvement.

¶ 54 Kosman also testified that the policy manual sets forth a system of progressive discipline but gives the chief of police discretion to proceed directly to termination. Kosman agreed the department was a paramilitary organization and that insubordination affects good order and discipline, as it compromises the department's ability to achieve its objectives.

¶ 55 e. Lieutenant Passwater

¶ 56 Lieutenant Passwater testified that on July 18, 2020, he was the shift commander. Before the march began, he went to Bird Park and determined, based on the size of the gathering, his presence was not needed.

¶ 57 At about noon, he received a call from Chief Kosman, who asked him to meet at the back of the courthouse but did not tell him why. Passwater arrived at the courthouse and saw Berge and

14

Kosman standing on the half-circle drive. Passwater exited his vehicle and approached them. He did not hear any conversation between them.

¶ 58 Kosman told Passwater that Berge had been acting inappropriately during the march and had not complied with his orders to leave the area and return to his shift, and that Berge was subsequently relieved of duty and ordered to go home for the day. Berge joined the conversation and told Passwater he did not believe he had done anything wrong. Berge then told Passwater that he would do whatever Passwater told him to do. Passwater told Berge, "Well, you have to do exactly what the Chief told you to do. And if he gave you an order to do something, then you need to do it." Berge said, "Okay. I'll go home then." Berge got into his vehicle and left the area.

¶ 59 Passwater believed Berge was "a very good officer." Berge had never been insubordinate to him. Passwater could not recall any time in his 31 years' experience that he was called to a location because a lower-ranking officer had failed to follow a lawful order of a superior officer.

¶ 60 2. *Berge's Evidence*

¶ 61 Berge testified that he graduated from the police academy in 2006 and was hired by the Kankakee Police Department as a patrol officer. After about five years, he was assigned to the special weapons and tactics team and the Kankakee Area Metropolitan Enforcement Group (KAMEG), an interagency group of officers who investigate drug crimes. According to Berge, no one questioned his integrity while he was assigned to KAMEG. On cross-examination, however, he acknowledged that he had been removed from KAMEG as a result of his use of nonprescription steroids.

¶ 62 On July 15, 2020, Berge was sitting in the sergeants' office at the end of the shift. Commander Austin came into the office and asked Berge about the homeless people congregating at the funeral home on the corner of Hickory and Dearborn. Austin told Berge they had received

15

complaints about the homeless people and that Berge was to issue tickets to them for open alcohol. Berge responded, "Well, they're homeless. They don't have jobs. I'm not going to write them City ordinance tickets for alcohol. They don't pay them anyway, plus that doesn't continue to build a relationship with them. It just makes them feel like we're out there trying to hammer them." Berge explained that, before the July 15 incident, he had been fostering a positive relationship with the homeless and had built a rapport with them.

¶ 63    After Berge told Austin he would not issue tickets to the homeless people, Austin immediately became enraged and "started getting loud." Berge explained, "It was kind of like how dare I question him and what he's telling us to do." Berge did not want to give the tickets, because he was trying the change the way the police dealt with homeless people and find alternatives to "just going out there and enforcing people with fines and arrests and things like that." Giving tickets would have ruined the relationship he had built. In the past, Berge had been allowed to give input on different areas of concern in the community and different alternatives to policing. In his role as sergeant, he allowed his patrol officers to have input and state their disagreement with his directives. If an officer disagreed, Berge and the officer would discuss "to some sort of positive direction we can take the situation." This was something he had learned in a supervisor training program.

¶ 64    Berge testified that Austin was staring at him, had his foot on a chair, and "kind of tried sticking his crotch" toward Berge, as if he was "posturing on" Berge. Berge was confused and did not know what was going on. Based on Austin's body language, his eyes, and his loud voice, he took Austin's actions as a sign of aggression. Berge was nervous and "actually felt like [Austin] wanted to fight him" or was "trying to get a reaction" from Berge.

16

¶ 65        Before Berge could respond, Austin told him that he had been relieved of his duty. Berge closed his eyes and "said an Our Father prayer in [his] head." Austin then knocked on the desk and called Berge's name. Berge opened his eyes and Austin said, "[y]ou fell asleep." Berge said he was "just tired." Berge believed closing his eyes had stopped Austin "from getting loud with" him.

¶ 66        At some point, Sergeant Klopp entered the office briefly and closed the door when he left. Tison was also in the office but left to start his preshift briefing. After Tison left, Berge got out of his chair and approached Austin. He explained he did so because he was afraid Austin was going to punch him and he could better react if he was in close proximity. Berge testified he was not trying to intimidate Austin; rather, Austin was trying to intimidate Berge.

¶ 67        When Klopp reentered the office, Berge sat back down. Austin again told Berge he had been relieved of his duty without providing an explanation. Austin also told Berge to go to his office. Berge refused to comply because Austin "was being so loud" and it seemed like Austin was "bait[ing]" or "setting him up for something." Berge believed the whole exchange was "absolutely ridiculous." Berge eventually left the building, about a few minutes after Austin first told him he had been relieved of duty. Berge did not leave immediately because he did not understand why he had been relieved of duty for saying he was not going to give tickets to the homeless people.

¶ 68        Berge testified he was not intoxicated during his interaction with Austin. He did not recall answering the phone during his interaction with Austin.

¶ 69        On July 18, 2020, Berge returned to work without restrictions. He did not have any specific duties. It was "[j]ust [a] normal supervisor day," which involved providing back up to his patrol officers, answering their questions, and checking their reports. He received no direction as to where he should or should not go.

17

¶ 70    Berge initially drove by the march out of curiosity. When he saw that the march consisted mostly of young children, he parked his car in a parking lot, got out, and began clapping and providing words of encouragement. Some of the marchers acknowledged Berge and waved back at him. The march continued and Berge followed. At another intersection, he parked his vehicle and sat on a half wall near a newspaper's office. Berge again waved at the marchers and asked the children if they wanted to look inside his vehicle and see how the lights worked. A woman acknowledged him and said, "We'll do it after [the march]." Berge explained he was trying to set a positive example for the department and foster a positive relationship with the community.

¶ 71    The march continued to the courthouse. Berge followed in his vehicle. He parked on the half-circle drive, got out of his vehicle, and approached the marchers. Berge did not see or hear Kosman as he walked toward the marchers. The march's leader asked Berge, "What's up?" Berge shook the leader's hand and continued toward the children "to go just interact with them." At that point, Sergeant Miller got Berge's attention and said Chief Kosman did not want Berge interacting with the marchers. Berge said, "Okay." He told the marchers, "Good job," and walked back toward his car.

¶ 72    Kosman confronted Berge. According to Berge, Kosman "was being loud with" him, "telling [Berge] he was giving [him] orders and this and that." Berge responded, "What orders? I didn't hear any orders." Berge continued toward his car, and Kosman said "I told you I didn't want you going by the kids and, you know, you're acting weird and this and that." Berge said, "You can't tell me that. *** That's unethical and immoral. *** They're children." Berge believed Kosman must have misunderstood his intent.

¶ 73    After this discussion, Kosman said, "Go home. You're suspended." Berge was surprised that he had been told to go home in consecutive shifts, something he had not experienced in his

time with the department. Berge did not understand why Kosman was upset with him or why he told him to go home. Berge did not immediately comply with Kosman's order because he was "trying to get clarification" as to "what was going on." Also, he was waiting for Lieutenant Passwater, who was Berge's direct supervisor that day, who "needed to know what's going on and what the situation was."

¶ 74 Berge also testified that he was interrogated in relation to the July 15 and 18 incidents. During his interrogation, he gave truthful answers and did not give "willful false testimony."

¶ 75 Berge believed he was being targeted because, in 2019, he filed a complaint against the department, alleging it had discriminated against white officers. Berge asked to admit the complaint and the Board denied his request.

¶ 76 On cross-examination, Berge testified he was not aware of any written policy that gave officers the ability to disregard a superior officer's orders. Berge denied telling Austin "this is our department, we're taking it back." During his interrogation, however, he stated he did not remember making the statement. Berge testified he did not see Kosman outside of his vehicle by the courthouse. Berge explained he was not paying attention to Kosman. When asked why the video showed Berge turn and face Kosman, Berge stated he "was attempting to listen to [his] radio." He heard radio traffic and turned up his radio because he had trouble hearing it. Berge stopped to listen to the radio, determined his assistance was not needed, and continued toward the marchers.

¶ 77 At the conclusion of Berge's testimony, a Board member asked if he had taken a position on a no-confidence vote officers had taken on the chief, deputy chief, a patrol commander, and a lieutenant. Before Berge answered, the Board's attorney stated the question was outside the scope of proceedings and an answer should not be given.

¶ 78                    3. *The Board Finds Berge Violated Department Policy*

¶ 79        At the close of evidence, the Board announced in an open session it found Berge violated sections 200.3, 200.3.1, 200.3.3, 341.3.2(k), 341.3.5(g), 341.3.5(i), and 341.3.5(af) of the policy manual. Before the matter proceeded to the "penalty phase," Berge filed a motion to strike and nullify the Board's decision. He asserted he was denied his due-process right to a fair hearing, based in part on the Board member's question concerning the no-confidence vote which he asserted demonstrated the Board's bias.

¶ 80                                 4. *Penalty Phase*

¶ 81        The matter proceeded to a "penalty phase" to determine the appropriate discipline for Berge's violations. Neither party presented testimony. In aggravation, Chief Kosman presented documents relating to Berge's past discipline, including documents relating to a 3-day suspension in 2008 for engaging in a physical altercation with a superior officer and a 30-day suspension in 2014 for using nonprescribed steroids. Kosman also presented a 2012 traffic crash report, in which Berge reported a hit-and-run on his personal vehicle, and a "last chance disciplinary agreement" that expired by its terms in April 2020. Berge objected to all of Kosman's exhibits, contending they should have been purged because he made a written request in 2017. The Board sustained Berge's objection to the last chance agreement but denied it as to the other documents. In mitigation, Berge presented numerous certificates and commendations he received during his employment at the department.

¶ 82        The Board heard arguments from the parties and adjourned to deliberate in a closed session.

¶ 83                        F. The Board's Written Findings and Decision

¶ 84        On December 1, 2020, the Board issued a written order terminating Berge from his employment. In its order, the Board summarized the evidence presented in 143 paragraphs. The

Board found Berge's conduct on July 15, 18, and 30, 2020, violated sections 200.3, 200.3.1, 200.3.3, 341.3.2(k), 341.3.5(f), 341.3.5(g), 341.3.5(i), and 341.3.5(af)[2] of the department's written policies. The court further determined its findings, when considered with the prior disciplinary actions imposed on Berge, amounted to cause for termination.

¶ 85                                  G. The Circuit Court Proceedings

¶ 86         Berge sought judicial review of the Board's decision under the Administrative Review Law. The circuit court affirmed the Board's decision, and this appeal followed.

¶ 87                                        II. ANALYSIS

¶ 88         Berge raises several contentions on appeal. First, he asserts his procedural due-process rights were violated in several respects. Second, he argues the Board's decision to terminate him was against the manifest weight of the evidence. Finally, he maintains his termination violated his first amendment rights. We address each argument in turn.

¶ 89                                      A. Standard of Review

¶ 90         On appeal from administrative proceedings, we review the agency's decision, not the circuit court's. *Roman v. Cook County Sheriff's Merit Board*, 2014 IL App (1st) 123308, ¶ 66. Generally, appeals from administrative proceedings present three types of questions: questions of fact, questions of law, and mixed questions of law and fact. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008). Our standard of review depends on the type of question presented. *Id.* When the question presented involves an agency's purely factual determination, we review the decision against the manifest weight of the evidence. *Id.* When the question presented is a question of law, our review is *de novo*. *Id.* And we review mixed questions

_____

[2]The Board's written decision does not mention paragraph (af) of section 341.3.5, despite the Board's oral pronouncement that Berge violated that paragraph. Generally, an oral pronouncement controls over a conflicting written order. *In re Tr. O.*, 362 Ill. App. 3d 860, 868 (2005).

of law and fact—that is, questions that involve the application of undisputed law to historical or established facts—under the clearly erroneous standard. *Id.* at 211. Under this standard, we will reverse only if our review of the record leaves us with the definite and firm conviction that a mistake has been made. *Id.*

¶ 91                                B. Procedural Due Process

¶ 92         Berge contends the proceedings in this case violated his procedural due-process rights. He asserts the Chief's notice of interrogation did not adequately apprise him of the nature of the investigation, which precluded him from preparing a defense. Relatedly, he asserts he was "found guilty" of "uncharged conduct." He also argues the proceedings were a "sham hearing" in that the Board was neither fair nor impartial.

¶ 93                                1. *The Due Process Clause*

¶ 94         "[A]n administrative proceeding is governed by the fundamental principles and requirements of due process of law." *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 92 (1992). The due-process clause "requires only such procedural protections as fundamental principles of justice and the particular situation demand." *Id.* Administrative proceedings do not require the same protections as a judicial proceeding. *Id.* Generally, a fair hearing is one which "includes the opportunity to be heard, the right to cross-examine adverse witnesses, and impartiality in ruling upon the evidence." *Id.* at 95. We review *de novo* whether an administrative proceeding complies with due process. *Wolin v. Department of Financial and Professional Regulation*, 2012 IL App (1st) 112113, ¶ 25.

¶ 95                                2. *The Notice of Interrogation*

¶ 96         Berge does not squarely contend the disciplinary charges were inadequate like he did before the Board. Rather, he focuses on the July 24, 2020, notice of interrogation, arguing it did

22

not meet the requirements of section 3.2 of the Uniform Peace Officers' Disciplinary Act (Act) (50 ILCS 725/3.2 (West 2020)) because it failed to identify the specific acts at issue and the specific rules or regulations alleged to have been violated.

¶ 97    The Act governs the formal investigation of complaints of noncriminal misconduct against peace officers and allows an officer to be interrogated in connection with alleged noncriminal misconduct. *Id.* § 3. Section 3.2 states, "No officer shall be subjected to interrogation without first being informed in writing of the nature of the investigation." *Id.* § 3.2. The written notice need not be precise; it need only "reasonably apprise the officer of the nature of the investigation." *Id.*; see *Ealey v. Board of Fire and Police Commissioners of City of Salem*, 188 Ill. App. 3d 111, 117 (1989).

¶ 98    In *Ealey*, the court found the following written notice "sufficiently apprised" the officer of the nature of the investigation under section 3.2:

> "You are hereby informed by this writing that allegations of misconduct have been lodged against you, and that an internal affairs investigation has been commenced to ascertain the facts surrounding the allegations. The allegations in this case include acts of moral turpitude, neglect of duty, conduct unbecoming a police officer, acts tending to discredit the police department, allowing unauthorized persons to ride in a squad car, acts of oppression[,] and sexual harassment." *Id.*

¶ 99    In *Roman*, 2014 IL App (1st) 123308, ¶ 99, the court found written notices sufficient under section 3.2 where they generally referred to the type of misconduct being investigated, that is, "Conduct Unbecoming a Correctional Officer[,] Unauthorized Secondary Employment[, and] Failure to notify the Proper Authority," and listed the dates of occurrence as "2007-2008." The officers asserted the notice was "too vague to have any meaning whatsoever, let alone sufficient

23

to 'reasonably apprise the officer[s] of the nature of the investigation' as required by section 3.2," because it did not contain any specific facts. *Id.* The court rejected the officers' argument, finding the notices "reasonably apprised [the officers] of the major charges against them and, therefore, of the nature of the investigations." *Id.* ¶ 100.

¶ 100 Here, the notice of interrogation stated "the purpose of the investigation" was to determine whether Berge (1) "violated any rules, regulations, or department procedures with respect to the performance of [his] duties, failure to follow commands and orders, and insubordination while on duty on July 15, 2020, and July 18, 2020," and (2) "fully and accurately reported [his] activities with respect to [his] work as a Kankakee Sergeant." As Berge points out, the notice does not state which of Berge's specific acts were the subject of the investigation or which written policies were alleged to have been violated. However, *Ealey* and *Roman* establish that general references to the type of misconduct being investigated alone are sufficient to reasonably apprise an officer of the nature of the investigation. Accordingly, we conclude the notice of interrogation complied with section 3.2 of the Act.

¶ 101 Moreover, the record rebuts Berge's contention that he did not have adequate notice of the specific written policies he was alleged to have violated. Just four days earlier, on July 20, 2020, Chief Kosman gave Berge a letter informing him that he had been placed on administrative leave. The letter stated the department was investigating incidents that occurred on July 15 and 18, 2020, where Berge "committed acts of insubordination by refusing to obey lawful orders from persons of superior rank in violation of [sections 200.3.3(b) and 341.3.5(f) of the policy manual]." The letter provided Berge with additional information concerning the nature of the investigation (see 50 ILCS 725/3.2 (West 2020)) and cited the specific written policies Chief Kosman believed, at the time, Berge had violated.

¶ 102                                   3. "*Uncharged Conduct*"

¶ 103          Berge also contends he was "found guilty" of "uncharged conduct." Specifically, he notes that the disciplinary charges alleged he violated sections 200.3, 200.3.1, 200.3.3, 341, and 341.3.5 of the department's policy manual. The Board, however, found his conduct on July 15, 18, and 31, 2020, violated sections 200.3, 200.3.1, 200.3.3, 341.3.2(k), 341.3.5(f), 341.3.5(g), 341.3.5(i), and 341.3.5(f) of the policy manual. Accordingly," Berge contends, he "was found guilty of uncharged conduct and was not appropriately put on notice of the specific charges."

¶ 104          Initially, we note Berge failed to provide this court with any citation of authority to support his argument. As a result, he has forfeited the contention. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *In re Marriage of Reicher*, 2021 IL App (2d) 200454, ¶ 33.

¶ 105          Forfeiture aside, in administrative proceedings, the charges or complaint need not be drawn with the same precision, refinements, or subtleties as pleadings in a judicial proceeding. *Abrahamson*, 153 Ill. 2d at 93. "Rather, the charge *** need only reasonably advise the respondent as to the charges so that he or she will intelligently be able to prepare a defense." *Id.* The charges here reasonably apprised Berge of the charges; and Chief Kosman's failure to cite specific subsections of the policy manual did not preclude Berge from preparing an intelligent defense. Indeed, our review of the record shows that, while Berge repeatedly professed an inability to discern which conduct formed the basis of the charges, he nevertheless presented an intelligent defense to the charges.

¶ 106                                   4. "*Sham Hearing*"

¶ 107          Berge further asserts the proceedings in this case amounted to a "sham hearing." His argument on this point is not entirely clear; he appears to argue that the Board's rulings and its members' conduct during the hearing demonstrated the Board did not act impartially but, rather,

was biased in Chief's Kosman's favor. We find Berge forfeited this issue by failing to support it with proper argument.

¶ 108    "A reviewing court is entitled to have the issues clearly defined and supported by pertinent authority and cohesive arguments; it is not merely a repository into which an appellant may dump the burden of argument and research." (Internal quotation marks omitted.) *U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 459 (2009). Under Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), the appellant must present to this court an argument "which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Rule 341(h)(7) requires "[b]oth argument and citation to relevant authority," and "[a]n issue that is merely listed or included in a vague allegation of error is not 'argued' and will not satisfy the requirements of the rule." *Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010); *Hall v. Naper Gold Hospitality, LLC*, 2012 IL App (2d) 111151, ¶ 12 (mere contention, without argument, does not comply with Rule 341(h)(7) and does not merit consideration). A party forfeits review of an issue that is not argued. *Vancura*, 238 Ill. 2d at 369.

¶ 109    In his brief, Berge lays out general standards applicable to claims of impartiality and bias in administrative proceedings. He then presents his "argument" on this issue, which is nothing but a list of the Board's actions and rulings that were adverse to him.

¶ 110    Berge's "argument" fails to comply with Rule 341(h)(7) and does not merit consideration. *Hall*, 2012 IL App (2d) 111151, ¶ 12. Berge merely lists vague allegations of error and does not provide any developed, reasoned analysis of the issue or how his list of the Board's purportedly unfair conduct and rulings entitles him to relief. Nor does Berge explain how the Board's rulings were wrong or attempt to show how the law he cites applies to the facts of this case. Moreover, Berge makes several factual assertions without citation of the record. We will not scour the record

26

to find support for Berge's vague allegations of error, and we will not develop an argument on his behalf. *First Mercury Insurance Co. v. Nationwide Security Services, Inc.*, 2016 IL App (1st) 143924, ¶ 21. We conclude Berge has forfeited review of this issue. *Vancura*, 238 Ill. 2d at 369.

¶ 111                    C. The Board's Findings and Decision

¶ 112                        1. *Adequacy of Written Decision*

¶ 113    Berge next takes issue with the Board's findings and decision. He asserts the Board's decision "failed to identify what acts amounted to insubordination" and "which acts accounted for which violation," seeming to imply the Board's written decision is too vague for meaningful judicial review. See *Medina Nursing Center, Inc. v. Health Facilities and Services Review Board*, 2013 IL App (4th) 120554, ¶¶ 19-27 (remanding the matter to the board to "issue a reasoned opinion so as to make possible a meaningful judicial review"); but see *Roman*, 2014 IL App (1st) 123308, ¶¶ 81-84 (finding the board's decision inadequate to review some of the issues, but declining to remand and instead holding any inadequacies against the board).

¶ 114    To the extent Berge, in fact, contends the Board's written decision is too vague to permit meaningful review, we find Berge has forfeited his contention by failing to cite relevant authority in its support. See *Reicher*, 2021 IL App (2d) 200454, ¶ 33. Forfeiture aside, we note this court has rejected *Medina Nursing Center* "to the extent it required the Board to articulate specific reasons for its decision." See *Mercy Crystal Lake Hospital and Medical Center v. Illinois Health Facilities and Service Review Board*, 2016 IL App (3d) 130947, ¶ 20. In doing so, we emphasized our role in administrative review actions, that is, "to determine whether the evidence in the record supports the agency's decision." (Internal quotation marks omitted.) *Id.* ¶ 20. We wrote, "Where the testimony and documentary evidence is preserved in the record, a reviewing court has a

sufficient factual basis upon which to determine whether an agency's decision is manifestly erroneous without the need for the agency to specify any factual basis for its decision." *Id.*

¶ 115     We acknowledge the Board's decision in this case leaves room for improvement. While the Board provided a detailed account of the evidence presented, the Board did not state how that evidence established the specific violations it found. Nevertheless, the record contains the testimonial and documentary evidence upon which the Board based its decision, and we are therefore able to determine whether the Board's findings and decision were against the manifest weight of the evidence.

¶ 116                                              2. *Manifest Weight*

¶ 117     The Board found Berge's conduct violated sections 200.3, 200.3.1, 200.3.3, 341.3.2(k), 341.3.5.(f), 341.3.5(g), 341.3.5(i), and 341.3.5(af) of the policy manual and concluded his conduct, viewed in light of his past discipline, warranted termination. Berge asserts the Board's decision was against the manifest weight of the evidence.

¶ 118     "Appellate review of an administrative agency's decision to discharge an employee generally has two stages." *Scatchell v. Board of Fire and Police Commissioners for Village of Melrose Park*, 2022 IL App (1st) 201361, ¶ 40. First, we determine whether the board's factual findings are against the manifest weight of the evidence. *Id.* We view the board's factual findings as " 'prima facie true and correct.' " *Id.* ¶ 36 (quoting 735 ILCS 5/3-110 (West 2020)). The board, not this court, assigns the appropriate weight to the evidence, resolves any conflicts presented by it, and determines the witnesses' credibility. *Id.* "We may not reweigh the evidence or make an independent determination of the facts." *Id.* Our deference to the board has limits: the record must contain competent evidence to support the board's decision. *Id.* ¶ 37. But "[i]f the record contains

28

evidence that supports the Board's factual conclusions, then we will not upset those findings, even if an opposite conclusion is also reasonable." *Id.*

¶ 119 Second, we determine whether the board's findings "provide a sufficient basis for the [board's] conclusion that cause exists to terminate the employee." *Id.* ¶ 40. We will not second guess the board's decision and reduce the discipline imposed merely because we would have been more lenient. *Id.* Instead, we focus our review on whether the board acted "unreasonably or arbitrarily by selecting a type of discipline that was inappropriate or unrelated to the needs of the service." *Id.*

¶ 120 a. The Board's Findings of Misconduct

¶ 121 The Board found against Berge on all three counts of the disciplinary charge, finding his conduct on July 15 (count I), July 18 (count II), and July 30 (count III) violated sections 200.3, 200.3.1, 200.3.3, 341.3.2(k), 341.3.5(f), 341.3.5(g), 341.3.5(i), and 341.3.5(af) of the policy manual.

¶ 122 Berge does not focus on the specific violations the Board found or how Chief Kosman's evidence failed to prove those violations. Rather, he lists several pieces of "critical evidence" he claims the Board overlooked or ignored and contends the Board should not have credited Kosman's evidence over his testimony that (1) Austin was the aggressor and provoked Berge on July 15, 2020, (2) he did not see Kosman or hear his orders to leave the area of the march on July 18, 2020, and (3) he was truthful during his interrogation when asked about the July 18 incident.

¶ 123 Essentially, Berge asks us to reweigh the evidence, make different credibility determinations, and come to a different conclusion than the Board. We will not do so. *Scatchell*, 2022 IL App (1st) 201361, ¶ 36. Our function is to determine whether the record contains competent evidence to support the Board's findings. *Id.* ¶ 37. We find it does.

29

¶ 124                                                  i. *Counts I and II*

¶ 125          As to counts I and II, the relevant sections of the policy manual are sections 200.3, 200.3.1, 200.3.3, 341.3.2(k), 341.3.5(f), 341.3.5(g), and 341.3.5(i). Sections 200.3, 200.3.1, and 200.3.3 of the policy manual set forth the department's command protocol. They establish a ranking hierarchy and chain of command, in descending order as follows: chief, deputy chief, commanders, lieutenants, sergeants, and patrol officers. Section 200.3.3(b) provides that officers are required to obey all lawful verbal orders of a superior officer.  Section 300.3.3(c) provides that, if an order is proper but in conflict with a previous order, the officer must respectfully inform the officer issuing the order. If the issuing officer does not alter or retract the conflicting order, the lower-ranking officer must obey the conflicting order and may not be held responsible for disobeying the previous order. Additionally, section 200.3.3(d) states officers must not obey any order which they know or should know would require them to commit an illegal act. Thus, under the policy manual, a lower-ranking officer must obey all orders from a superior, unless the order is unlawful, that is, it would require the lower-ranking officer to commit an illegal act.

¶ 126          Section 341.3 governs the conduct of police officers and includes a nonexhaustive list of types of misconduct that may be grounds for discipline. However, section 341.3 also provides discipline may be recommended for any action or inaction "that is detrimental to efficient department service." Section 341.3.2(k) proscribes "[d]iscourteous, disrespectful[,] or discriminatory treatment of *** any member of [the] department." Section 341.3.5(f) proscribes "[d]isobedience or insubordination to constituted authorities, including refusal or deliberate failure to carry out or follow lawful directives and orders from any supervisor or person in a position of authority." Section 341.3.5(g) proscribes "[t]he wrongful or unlawful exercise of authority on the part of any employee for malicious purpose, personal gain, willful deceit[,] or any other unlawful

30

purpose." Section 341.3.5(i) proscribes "[k]nowingly making false, misleading, or malicious statements that are reasonably calculated to harm, destroy, or discredit the morale, reputation, authority[,] or official standing of" department members.

¶ 127　　　　Based on the evidence presented, the Board could reasonably conclude Berge's conduct on July 15, 2020, violated the policy manual and, therefore, find in Kosman's favor on count I. Kosman's evidence showed that before Berge's end-of-shift conduct on July 15, 2020, Austin twice spoke to Berge, once in person and once on the phone, about the complaints the department had received regarding the funeral home at Hickory and Dearborn. He told Berge to have an officer check on the property and issue citations if any ordinance violations were seen. Berge did not raise an objection to the directive at the time. Austin heard radio traffic during the day that an officer had been to the location and, at the end of Berge's shift, asked Berge, the on-duty patrol sergeant, what had happened. When Austin arrived in the sergeants' office, he asked Berge about the call in a calm and inquisitive manner. Berge did not acknowledge Austin's presence or respond to his question and instead mumbled incoherently. He remained in his chair, leaned back with his feet on the desk. Berge, however, responded to Tison—an officer of equal rank—when Tison asked him whether he was okay. Austin got Berge's attention and again asked about the funeral home. Instead of answering the question of what action was taken at the funeral home, Berge feigned ignorance to what Austin was referring, despite the fact Austin had already twice discussed the matter with him that day. Berge grew increasingly agitated, got into Austin's face, asked Austin what he had done in his three years as commander, told Austin he did not know how to do his job and anyone would agree, and told Austin the department was no longer his and the officers were "going to take [it] back." Both Berge's and Austin's voices were raised during their conversation and could be heard (though maybe not discerned) through a closed door.

31

¶ 128    Berge interrupted his discussion with Austin—which related to his performance of an assigned task—by answering the clerk's telephone call. Austin told Berge their discussion was not over and ordered Berge, five times, to hang up the telephone, stating Berge could call the clerk back. But Berge continued with the call until Austin himself disconnected the call.

¶ 129    Austin directed Berge to his office where they could continue their discussion. Berge refused and told Austin, several times, "to get out of the [sergeants'] office." Austin then told Berge he had been relieved of his duties for the day and ordered him to go home. Berge did not acknowledge the order for at least 30 to 60 seconds until Sergeant Klopp—another officer of equal rank—suggested that Berge follow Austin's direct order.

¶ 130    This evidence, which the Board was free to accept, establishes Berge (1) was discourteous and disrespectful to Austin, a superior officer, during their interaction in the sergeants' office in violation of section 341.3.2(k) of the policy manual; (2) was disobedient and insubordinate to Austin in that he failed to answer a direct question about the funeral home call and follow *multiple* direct, lawful orders to hang up the telephone in violation of section 341.3.5(f); and (3) made malicious statements that were calculated to harm or discredit Austin's morale, reputation, authority, or official standing in violation of section 341.3.5(i). Accordingly, we conclude the Board's finding on count I was not against the manifest weight of the evidence.

¶ 131    Likewise, based on the evidence presented, the Board could reasonably conclude Berge's conduct on July 18, 2020, violated the policy manual and, therefore, find in Kosman's favor on count II. Kosman's evidence established that on July 18, 2020, Kosman assigned himself, Sergeant Miller, and Officer Gearhart to assist with the protest march. Due to the size of the march, he believed three officers would be sufficient to control traffic and guide the march through the street. He did not want any officers interacting with the marchers.

32

¶ 132        Kosman did not assign Berge to the march detail. But Berge showed up anyway and followed the march to the courthouse. Kosman's testimony and the video footage established that when the marchers arrived at the courthouse, Berge exited his vehicle and began walking toward them. Kosman called out to Berge and ordered him back to go back to his vehicle and leave the area. Berge stopped and acknowledged Kosman as Kosman exited his vehicle and again ordered Berge to leave. But Berge waved off Kosman and continued toward the marchers. Kosman followed, repeating his order to leave the area. Berge continued on.

¶ 133        Sergeant Miller walked to Berge, who by then was with the marchers, and told Berge that Kosman did not want Berge by the marchers. Berge then walked back toward his vehicle, right past Kosman. Kosman stopped Berge and confronted him about disobeying his order to leave the area. Kosman told Berge he had been dismissed for the day and to go home. Instead of doing so, Berge told Kosman his orders were unlawful. Berge then told Kosman he was a "poor leader" and "it was time for [Kosman] to retire." Kosman had not witnessed this level of insubordination in his 34 years as a police officer. Despite being given an order to leave, Berge remained at the courthouse until Lieutenant Passwater showed up. When Passwater suggested that Berge follow Kosman's direct order, Berge finally complied.

¶ 134        This evidence, which again the Board was free to accept, establishes Berge (1) was discourteous and disrespectful to Kosman, the highest-ranking officer in the department, during their interaction on July 18, 2020, in violation of section 341.3.2(k); (2) was disobedient and insubordinate to a Kosman in that he disobeyed Kosman's lawful orders to leave the area and to go home for the day in violation of section 341.3.5(f); and (3) made malicious statements that were calculated to harm or discredit Kosman's morale, reputation, authority, or official standing in

33

violation of section 341.3.5(i). Accordingly, we conclude the Board's finding on count II was not against the manifest weight of the evidence.

¶ 135    In reaching our conclusion as to counts I and II, we find Kosman's evidence did not establish Berge violated section 341.3.5(g), which proscribes "[t]he wrongful or unlawful exercise of authority on the part of any employee for malicious purpose, personal gain, willful deceit[,] or any other unlawful purpose." Simply put, the evidence did not establish Berge exercised his authority as a police sergeant for an improper or unlawful purpose.

¶ 136    Additionally, we reject Berge's suggestion that he was justified in disobeying Austin's and Kosman's orders. Under section 200.3.3(d) of the policy manual, an order is unlawful only when it requires an officer to perform an "illegal" act. Because neither Austin's nor Kosman's orders required Berge to commit an illegal act, they were lawful orders that should have been followed. And to the extent those orders conflicted with other policies, orders, or officer training, Berge could respectfully object but under section 200.3.3(c), was nevertheless required to comply.

¶ 137    We also reject Berge's assertion that Austin and Kosman provoked Berge's conduct on the dates in question. Berge sought to establish that Austin and Kosman grew unreasonably angry with Berge when Berge challenged their orders and suggests his actions were justified based on their heightened response. However, the evidence supported the opposite conclusion, and the Board was free to reject Berge's testimony. *Scatchell*, 2022 IL App (1st) 201361, ¶¶ 36-37.

¶ 138                                ii. *Count III*

¶ 139    We also conclude the Board's finding that Berge was untruthful during his July 30, 2020, interrogation was not against the manifest weight of the evidence. Section 341.3.5(af) of the policy manual prohibits an officer from "[g]iving false or misleading statements or misrepresenting or

34

omitting material information to a supervisor, or other person in a position of authority, in connection with any investigation or in the reporting of any department-related business."

¶ 140    The record establishes that, during his interrogation, Berge, while under oath, stated that he did not see or hear Kosman before he approached the marchers and did not wave off Kosman after Kosman ordered him back to his vehicle. The videos from the courthouse, however, paint a different picture. They show Berge acknowledge, walk toward, and interact with Kosman, before waving his right hand in a downward motion and continuing toward the marchers.

¶ 141    Based on this evidence, the Board could reasonably conclude Berge gave false or misleading statements during his interrogation. Berge nevertheless contends that, because there was evidence the marchers were chanting at certain points, it would have been reasonable for the Board to conclude Berge did not, in fact, hear Kosman's direct orders. This contention improperly asks us to reweigh the evidence. See *Scatchell*, 2022 IL App (1st) 201361, ¶ 40. Because the Board's factual findings are supported by competent evidence in the record, we may not upset those findings—"even if an opposite conclusion is also reasonable." *Id.* Accordingly, we conclude the Board's finding on count III was not against the manifest weight of the evidence.

¶ 142                                b. Termination

¶ 143    Having found the Board's findings are supported by the evidence, we turn to whether the Board's findings provided a sufficient basis for its conclusion that cause existed to terminate Berge. *Scatchell*, 2022 IL App (1st) 201361, ¶ 37. "Cause is some substantial shortcoming which renders the employee's continuance in office in some way detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good cause for his [or her] no longer holding the position." (Internal quotation marks omitted.) *Id.* ¶ 86. Again, our focus is not whether we would have been more lenient; rather, we must determine whether the

Board "acted unreasonably or arbitrarily by selecting a type of discipline that was inappropriate or unrelated to the needs of the service." (Internal quotation marks omitted.) *Id.*

¶ 144    We find the Board's findings provided a sufficient basis for it to conclude cause existed to terminate Berge. The Board found Berge was disrespectful and insubordinate to his superior officers on two consecutive shifts and lied during an interrogation concerning his misconduct.

¶ 145    We begin with the finding that Berge lied during his interrogation. "The job of a police officer requires the utmost integrity and honesty." *Rios v. Cook County Sheriff's Merit Board*, 2020 IL App (1st) 191399, ¶ 34. Thus, a police officer's single act of untruthfulness, under the facts of a given case, may be cause for termination. *City of Country Club Hills v. Charles*, 2020 IL App (1st) 200546, ¶¶ 32-36; *Slayton v. Board of Fire and Police Commissioners of Village of Streamwood*, 102 Ill. App. 3d 335 (1981); *Kupkowski v. Board of Fire and Police Commissioners of Village of Downers Grove*, 71 Ill. App. 3d 316, 324-25 (1979). The rationale is that future criminal prosecutions will be compromised by the testimony of an officer who has previously been found to have lied. *Charles*, 2020 IL App (1st) 200546, ¶¶ 23-24, 32-33.

¶ 146    Berge made three false statements, under oath, at his interrogation. There is no question that this is a substantial shortcoming which renders Berge's continued employment detrimental to the department's operation. See *Charles*, 2020 IL App (1st) 200546, ¶¶ 32-36; *Scatchell*, 2022 IL App (1st) 201361, ¶ 86. Indeed, any future criminal investigations and prosecutions in which he is involved may be compromised. Based on this finding alone, the Board could properly find good cause for Berge's termination. *Charles*, 2020 IL App (1st) 200546, ¶¶ 33, 36.

¶ 147    The Board also found Berge was disrespectful and insubordinate to his superior officers on two consecutive shifts. The evidence showed that Berge believed he could pick and choose which orders he wished to follow and ignored lawful orders from Austin and Kosman. The evidence also

36

showed that Berge displayed his disrespect and insubordination in view of at least 12 patrol officers in one instance and in view of the general public in the other.

¶ 148     "Police departments, as paramilitary organizations, require disciplined officers to properly function, and it is appropriate for those departments to punish officers who violate rules, regulations, or orders." *Scatchell*, 2022 IL App (1st) 201361, ¶ 88; *Launius v. Board of Fire and Police Commissioners of City of Des Plaines*, 151 Ill. 2d 419, 436 (1992). In *Martin v. Matthys*, 149 Ill. App. 3d 800, 808 (1986), the court rejected the officer's argument that his refusal to follow his chief's order was justified, writing,

> "The police department is a para-military organization with a chain of command leading to the chief of police. In order to establish and maintain a leadership role, the chief of police must command the respect and obedience of all officers. Flagrant, deliberate[,] and continuing disobedience, especially by an officer of high rank and ten years of experience, undermines that authority and weakens the entire structure of the organization. [Citations.] A rule permitting each officer to subjectively determine whether he believes an order to be lawful and reasonable would destroy the discipline necessarily inherent in a para-military organization such as the police department. [Citations.] A police officer does not have the prerogative of actively disobeying an order from a superior while seeking a determination as to the validity of that order. Such a practice would thwart the authority and respect which is the foundation of the effective and efficient operation of a police force. [Citations.] Thus, plaintiff's conduct cannot be excused. [Termination] was clearly related to the needs of the *** department."

¶ 149 We likewise conclude Berge's conduct cannot be excused. His flagrant disregard of his superior officer's orders, on two consecutive shifts, "thwart[ed] the authority and respect which is the foundation of the effective and efficient operation of [the department]," and his termination was clearly related to the department's needs. *Id.*

¶ 150 Moreover, the Board did not view the three incidents at issue here in a vacuum. Rather, it received evidence that Berge had been suspended on two occasions earlier in his career: (1) a 3-day suspension in 2008 for engaging in a physical altercation with a superior officer, and (2) a 30-day suspension in 2014 for using nonprescribed steroids.

¶ 151 Berge contends the Board should not have been allowed to consider his prior misconduct due to his 2017 written request to purge his file. He cites section 2 of the Personnel Record Review Act (820 ILCS 40/2 (West 2020)), which states an employee, upon request, must be permitted to inspect any personnel documents that may be used when taking disciplinary action. He offers no analysis of the issue, and it is therefore forfeited. *Vancura*, 237 Ill. 2d at 369.

¶ 152 Forfeiture aside, we find the Board properly received evidence of Berge's prior suspensions. Section 341.3.10(a) of the policy manual states "[a]ll records and supporting documents that relate to interdepartmental disciplinary action may be placed in the Employee's Personnel File and will remain in said file indefinitely at the discretion of the Chief." In addition, section 341.3.10(c) states "[r]ecords and supporting documents that relate to any disciplinary action taken by the [Board] against any employee will be maintained in the Employee's Personnel File." And under section 341.3.10(b), only oral or written *reprimands* may be expunged from personnel files and only under certain circumstances. Berge's prior suspensions were part of his employee personnel record and could properly be considered by the Board when deciding whether to terminate Berge. See *e.g.*, *Davis v. City of Evanston*, 257 Ill. App. 3d 549, 557 (1993).

¶ 153    Berge also contends the Board disregarded the progressive discipline continuum in the policy manual. However, section 341.2.1(c), which sets forth the continuum, states "[N]othing in the continuum prevents the Chief of Police, or a designee, from bypassing any part of the continuum." The Board was in the best position to determine whether some lesser form of discipline was appropriate and concluded, under the circumstances, it was not. We may not second guess that decision. *Scatchell*, 2022 IL App (1st) 201361, ¶ 86.

¶ 154    We acknowledge that Berge was employed by the department for more than 14 years, during which time he had few disciplinary issues and received numerous certificates and commendations. The Board, however, was not required to put dispositive weight on the mitigating evidence. *Kappel v. Police Board of City of Chicago*, 220 Ill. App. 3d 580, 596 (1991). Nor was the Board required to impose a lesser discipline "solely because [Berge] provided numerous years of good service." *Id.* Simply put, under the circumstances of this case, we cannot say the Board "acted unreasonably or arbitrarily by selecting a type of discipline that was inappropriate or unrelated to the needs of the service." (Internal quotation marks omitted.) *Scatchell*, 2022 IL App (1st) 201361, ¶ 86. Accordingly, we conclude the Board's decision to terminate Berge was not against the manifest weight of the evidence.

¶ 155                                            D. First Amendment

¶ 156    Finally, defendant contends his termination violated his first amendment right to free speech. We again conclude defendant has forfeited this issue by failing to present a reasoned argument in its support. See *Vancura*, 238 Ill. 2d at 369.

¶ 157    Berge merely states this contention and without presenting a reasoned argument in its support. His "argument" consists of a single paragraph setting forth some general principles concerning a public employee's first amendment rights to hold or express beliefs contrary to those

of his superior. See *Pickering v. Board of Education of Township High School District 205, Will County, Illinois*, 391 U.S. 563 (1968); *Rankin v. McPherson*, 483 U.S. 378 (1987); *Slocum v. Fire and Police Commission of City of East Peoria*, 8 Ill. App. 3d 465 (1972). Berge offers nothing more than a vague allegation of error and fails to offer any explanation of how his termination violated his first amendment rights. Accordingly, we conclude he has forfeited this issue. *Vancura*, 238 Ill. 2d at 369.

¶ 158                                III. CONCLUSION

¶ 159        For the foregoing reasons, we affirm the judgment of the circuit court of Kankakee County.

¶ 160        Affirmed.